DISCIPLINARY COUNSEL *v.* HOSKINS, JUDGE.

[Cite as *Disciplinary Counsel v. Hoskins,*
119 Ohio St.3d 17, 2008-Ohio-3194.]

(No. 2008-0352—Submitted May 20, 2008—Decided July 3, 2008.)

**Per Curiam.**

{¶ 1} Respondent, Jeffrey Jay Hoskins of Hillsboro, Ohio, Attorney Registration No. 0017133, is admitted to the practice of law in Ohio and has served as judge of the Highland County Court of Common Pleas since February 2003.

{¶ 2} The Board of Commissioners on Grievances and Discipline has recommended that we permanently disbar respondent, based on findings that he committed numerous improper acts incompatible with his duties as a judge and a lawyer, including attempting to conceal a possible conflict of interest and to benefit secretly from the illegally acquired funds of a known felon. Respondent objects to the board's recommendation, arguing that some findings of misconduct are not supported by the requisite clear and convincing evidence and that the recommended sanction is too harsh. We overrule the objections, agree that respondent violated the Code of Judicial Conduct and the Code of Professional Responsibility as found by the board, and accept the recommendation to disbar.

{¶ 3} Relator, Disciplinary Counsel, charged respondent in a multiple-count complaint with repeatedly failing to conform to ethical standards for judges and attorneys both in and out of the courtroom. A three-member panel of the board heard the cause, including the parties' extensive stipulations, and made findings of fact and conclusions of law, unanimously recommending permanent disbarment. The board adopted all the findings of misconduct and the recommendation.

## I. Misconduct

{¶ 4} The panel and board found that respondent had violated Canons and Disciplinary Rules in connection with eight of the nine counts of the complaint.

The panel found also that the ninth count, alleging various misstatements in respondent's application for a federal judgeship, was also supported by the evidence. All of the remaining counts raise serious charges, but two counts implicate especially unconscionable conduct for a member of the judiciary. We begin our review with respondent's most egregious acts and then take the counts in order.

## A. Counts IV and VII: Respondent's Attempt to Conceal a Possible Conflict of Interest and to Benefit from Illegally Acquired Funds

{¶ 5} In April 2005, respondent filed articles of incorporation to form Three Irish Sons, Inc., naming himself and his wife as directors. Respondent also served as statutory agent for the corporation, and his wife served as president. The same month, Three Irish Sons bought the "Fifth Third" building in downtown Hillsboro, planning to lease office space to the Adult Parole Authority ("APA").

### 1. Respondent's Reaction to Suggestions of Impropriety

{¶ 6} Three Irish Sons, with respondent and his wife, each individually, borrowed $253,200, the purchase price for the Fifth Third building, from NCB Bank. As security for the bank note, the building, appraised at $295,000, was mortgaged along with other property that respondent held jointly with his wife. The note required payment of approximately $261,800 on demand or by October 21, 2005, at the latest.

{¶ 7} Respondent participated in purchasing the Fifth Third building, part of which the APA eventually did lease, even though he is the only common pleas judge in Highland County and regularly presides over criminal cases in which APA representatives appear as witnesses. Respondent did not immediately realize that the purchase and lease could lead to questions about his impartiality toward APA sentencing recommendations, but he became concerned when he was warned that these transactions might violate R.C. 2921.42 (having an unlawful interest in a public contract). Ultimately, both possible improprieties prompted respondent to take steps to divest himself of at least the appearance of ownership of, albeit not his control over, the Fifth Third building.

{¶ 8} Beginning in August 2005, respondent set out to reduce the perception of his dominion over the Fifth Third building. First, his wife, acting in her capacity as president of Three Irish Sons, transferred the corporation to herself by issuing 500 shares of stock with no par value in her name. Second, respondent's wife, again acting as president, executed a close-corporation agreement, pursuant to which she remained president but also became the sole director, the corporate secretary, and the corporate treasurer. Third, respondent resigned as statutory

agent. Fourth, respondent's wife leased to herself individually the building space that APA did not want for a term of 20 years with an annual rent of $1. Fifth, and most significantly, respondent's wife sold all of the Three Irish Sons stock to Gordon Yeullig, respondent's close friend, in return for Yeullig's assumption of $200,000 on the NCB bank note. Last, respondent asked NCB bank to refinance the note to reflect the price Yeullig had agreed to pay for the stock. The bank refused to split the indebtedness.

{¶ 9} On October 21, 2005, respondent, his wife, and Three Irish Sons defaulted on the NCB Bank note. Respondent and his wife later signed a new note for $267,800. To secure this note, respondent, his wife, and Three Irish Sons again mortgaged the Fifth Third building and other property owned by respondent and his wife. This time, however, Yeullig signed the mortgage as president of Three Irish Sons to pledge the Fifth Third building as collateral.

2. Respondent Assumes De Facto Authority over the Fifth Third Building

{¶ 10} Despite the divestiture of his ownership on paper, respondent nevertheless continued to exercise control over the Fifth Third building, manifesting a de facto ownership interest in the property. Respondent, not Yeullig, would eventually negotiate to sell the building to David Bliss, a felon who respondent believed had access to funds acquired in a credit-card scam for which Bliss had been convicted. Respondent tried to sell Bliss the building for $890,000, $595,000 more than the bank's appraised value, hoping thereby to (1) profit from the illegally obtained proceeds and solve his own financial problems and (2) recoup $25,000 in loans that he had made to either Bliss or Bliss's wife. He planned to structure the purchase in such a way as to evade criminal charges for money laundering.

{¶ 11} We know that respondent engaged in these negotiations on his own because Bliss wore a concealed device to record their conversations in connection with a criminal investigation of respondent's activities. Most disturbing of these transcribed conversations is a lengthy colloquy on December 13, 2005, in which respondent pitched his plan for Bliss's purchase of the Fifth Third building through a transfer of Three Irish Sons stock. In explaining how to structure the transaction, respondent made a number of admissions, including the fact that he had initially transferred the stock to his good friend Yeullig to conceal the conflict between his duty to impartially sentence criminals and his financial interest in the lease agreement with the APA.

{¶ 12} The December 13 conversation took place while respondent and Bliss were parked across the street from the Fifth Third building. Respondent advised Bliss on that day that Bliss could now legally enjoy the proceeds of his credit-card fraud because the statute of limitations on those criminal charges had passed. Respondent then told Bliss "step-by-step" how to get his money from

England to the United States, warning that they had to be "very careful" to avoid any suspicion of money laundering.

{¶ 13} Respondent told Bliss that the money-laundering statute could be triggered with each transfer of funds and admonished that the statute applied not just to Bliss, but to whomever Bliss might transfer the money to, unless the transfer was made in "a certain * * * format." Continuing his tutorial, respondent advised Bliss that the key to avoiding money-laundering charges was to make sure that "you're not running this money out to somebody and then you're getting it back cleaned up." Respondent also advised that if Bliss used his money to purchase something "for reasonably close to fair-market value," then the transfer would not constitute money laundering.

{¶ 14} Respondent went on to say that though he realized Bliss did not want to buy real estate and have his name recorded on the deed, he knew of a safe way to sell Bliss the Fifth Third Bank building. Directing Bliss's attention to the Fifth Third building across the street, respondent proclaimed: "*I* bought that bank building," "*I* have tenants that pay approximately $5,000 a month," and "*I've* got huge loans on that bank building." (Emphasis added.) Respondent added, "I think I can get a million dollars out of that" and then falsely imparted that he owed $890,000 on the building.

{¶ 15} Respondent next revealed his strategy for the sale. He reported that ownership of corporate assets, including real property, may be transferred through the sale of all the corporate stock and that these transfers are neither registered nor recorded publicly. In other words, the sale of such assets could be consummated in private. Respondent went on to advise Bliss that the Fifth Third building was "owned as a corporation" and thus that Bliss could buy the property with no one but the principals in the transaction knowing about it.

{¶ 16} Respondent then outlined the benefits of selling the building to Bliss through a stock transfer. Respondent claimed that the deal would help respondent "dramatically" and get him "out from under some guns that [he has] to [his] head." Bliss, in turn, would not only acquire the building, but as the purchaser of the corporate shares would also acquire the corporate bank account, giving him a safe, unquestioned depository for his overseas funds. In addition, Bliss would receive $5,000 in gross rent each month from the APA.

{¶ 17} Later in this negotiation, respondent admitted the reason for which he had transferred ownership of the Fifth Third building:

{¶ 18} "Speaker Hoskins: No one will know who owns the building.

{¶ 19} "Speaker D. Bliss: Oh, all right.

{¶ 20} "Speaker Hoskins: Because the shares are not recorded. Now, I had to transfer those shares—

{¶ 21} "Speaker D. Bliss:  Uh-huh.

{¶ 22} "Speaker Hoskins:  —to a third party because when the tenant moved in, when the Adult Probation Department moved in, they appear in my court on a daily basis.

{¶ 23} "Speaker D. Bliss:  Right.

{¶ 24} "Speaker Hoskins:  Okay.  And I can't rent to somebody who appears in my court on a daily basis.

{¶ 25} "Speaker D. Bliss:  That shows what, favorite—not favoritism.

{¶ 26} "Speaker Hoskins:  Conflict of interest.

{¶ 27} "Speaker Bliss:  That's what I'm thinking.

{¶ 28} "Speaker Hoskins:  And so I—my wife has all of the building except for [what] the APA has, and the corporation has that.  And the corporation shares are right now owned by Gordon Eulich [sic, Yeullig], a friend of mine.

{¶ 29} "Speaker D. Bliss:  Okay.

{¶ 30} "Speaker Hoskins:  And all I'll do is tell Gordon that, you know, we—I transferred it to Gordon because of this conflict of interest.  He—

{¶ 31} "Speaker D. Bliss:  Right.

{¶ 32} "Speaker Hoskins:  But I'll—I'll have to give him something for his time and effort, and that'll come out of the—

{¶ 33} "Speaker D. Bliss:  Right.

{¶ 34} "Speaker Hoskins—890.  * * * And then he will transfer the shares directly to you."

{¶ 35} From this exchange, we know that respondent was aware that his part of Three Irish Sons' interest in the APA leasehold agreement threatened or at least would be perceived as threatening his ability to dispense justice evenhandedly in cases involving APA witnesses.  We also know that though he was aware of the impropriety, respondent did not rid himself of the conflict by severing all ties to the offending business venture.  He instead tried to surreptitiously protect those ties and still reap whatever financial gain he could from the venture.

3.  Respondent Violated Canons and Disciplinary Rules

{¶ 36} Judicial and professional misconduct must be shown by clear and convincing evidence.  *Ohio State Bar Assn. v. Reid* (1999), 85 Ohio St.3d 327, 708 N.E.2d 193, paragraph two of the syllabus.  "Clear and convincing evidence" has been defined as " 'that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to

be established.' " Id. at 331, 708 N.E.2d 193, quoting *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph three of the syllabus. The proof of respondent's improprieties meets this standard.

{¶ 37} Canon 1 requires a judge to uphold the integrity and independence of the judiciary. Canon 2 requires a judge to respect and comply with the law and act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. Canon 3(E)(1) requires judges to disqualify themselves in proceedings in which their impartiality might reasonably be questioned. Canon 4 requires a judge to avoid impropriety and the appearance of impropriety in all of the judge's activities.

{¶ 38} As to Count IV, we find that respondent plotted to circumvent safeguards for ensuring that judicial decisions result from legitimate credibility assessments and legal analysis and not from improper influence or competing personal interests. Respondent's duplicity unquestionably violated judicial duties to act and appear to act with integrity, independence, and impartiality under Canons 1, 2, 3(E)(1), and 4. His scheme at the same time violated DR 1–102(A)(4) by manifesting conduct involving dishonesty, deceit, misrepresentation, or fraud.

{¶ 39} In finding this misconduct, we reject respondent's argument that neither his partiality nor his need to disqualify himself under Canon 3(E)(1) was proven by clear and convincing evidence. It is true that respondent has twice avoided disqualification from presiding over various criminal cases in which APA representatives testified as to presentence investigations and recommendations. See *In re Disqualification of Hoskins*, case Nos. 07–AP–92 and 01–AP–015. But in neither of those prior proceedings was there any allegation that (1) respondent knew that his interest in the APA lease agreement was a threat or appeared to be a threat to his impartiality or (2) that he had contrived a way to conceal that interest in order to avoid an appearance of partiality. Such machinations are ample cause for concern over respondent's ability to render fair and unbiased decisions and clearly trigger the disqualification requirement of Canon 3(E)(1).

{¶ 40} We also find violations of Canons 1, 2, and 4 as to Count VII. Respondent attempted to broker a deal to profit from illegally obtained funds, which again unquestionably violated his duties to act and appear to act with integrity, independence, and impartiality. Such improprieties constitute conduct prejudicial to the administration of justice, a violation of DR 1–102(A)(5), and also reflect adversely on respondent's fitness to practice law, a violation of DR 1–102(A)(6). Moreover, by exaggerating the value of the Fifth Third building as the conduit for his profit, respondent violated DR 1–102(A)(4).

{¶ 41} In finding this misconduct, we are not swayed by the argument that respondent simply exercised poor judgment in negotiating with Bliss. Respon-

dent reminds us that he has been acquitted of criminal conduct in two trials; however, the lack of a conviction requiring proof beyond a reasonable doubt hardly precludes us from finding the same conduct to be unethical. Judges are accountable for much more than merely conducting themselves within the bounds of the criminal law. *Ohio State Bar Assn. v. Reid,* 85 Ohio St.3d at 330, 708 N.E.2d 193; *Mahoning Cty. Bar Assn. v. Franko* (1958), 168 Ohio St. 17, 23, 5 O.O.2d 282, 151 N.E.2d 17 (holding judges to the "highest" ethical standards).

{¶ 42} " 'Because they are so important to our society, judges must be competent and ethical, and their actions must foster respect for their decisions as well as for the judiciary as a whole. Given that they hold positions of considerable authority and are entrusted with a great deal of power and discretion, judges are expected to conduct themselves according to high standards of professional conduct. Indeed, it is often said that judges are subject to the highest standards of professional behavior.' " *Disciplinary Counsel v. O'Neill,* 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 57–58, quoting Shaman, Lubet & Alfini, Judicial Conduct and Ethics (3d Ed.2000) 1.

{¶ 43} Respondent's conduct fell far short of this standard. Respondent had been financially involved with the Blisses since 1999, when as a private attorney he had obtained Bliss's early judicial release from federal custody. The sale of the Fifth Third building was an attempt to secretly take advantage of the credit-card fraud proceeds to which respondent believed Bliss or his wife still had access.

{¶ 44} Respondent claims that he was merely trying to recoup his $25,000 in loans to the Blisses through legal means. Yet he persisted in these unsavory dealings weeks after being strongly advised against it by his own counsel in December 2005. At that time, respondent contacted lawyer Glenn Whitaker and laid out his plan to sell the Fifth Third building, including the fact that Bliss had obtained money to pay for the property illegally. Whitaker advised respondent that "[a]s long as you can't establish that the money was from a legitimate source, you can't take it." During a second conversation that December, Whitaker warned respondent that the Bliss deal might be a setup by law enforcement.

{¶ 45} But respondent would not let it go. In January 2006, he coached Bliss in another recorded conversation on how he needed Bliss's wife to say that the money was hers and that "she got it through legitimate means." Respondent also suggested that Bliss's wife borrow money for the Fifth Third purchase and that Bliss repay her with the tainted funds.

{¶ 46} Respondent doggedly pursued the Blisses for his own profit despite all indicators of impropriety. With his conniving and self-dealing, respondent has shown nothing but disdain for his duties to act and appear to act in accordance with the highest standards of integrity, independence, and impartiality. As a

result, he has done much to tarnish the judiciary as a whole and undermine public confidence in our system of justice. For this series of transgressions, sanctions are appropriate.

### B. Count I: Respondent's Public Comment on an Impending Case

{¶ 47} Canon 3(B)(9) prohibits a judge from commenting publicly on a pending or impending proceeding in any way that might "reasonably be expected to affect its outcome or impair its fairness." Respondent admits that he violated this Canon by issuing a press release commenting on the results of a polygraph examination administered to a court employee who was later indicted. He denies, however, that his comments also constituted conduct prejudicial to the administration of justice in violation of DR 1–102(A)(5).

{¶ 48} Tammy Sandlin worked as respondent's office administrator, chief assignment commissioner, part-time bailiff, and part-time secretary. She was indicted in June 2005 for altering Magistrate Cynthia Williams's entry assessing costs to the parties in Sandlin's 1994 divorce. In response to criticism of his decision to suspend Sandlin with pay rather than terminate her employment after her indictment, respondent issued a press release strongly implying that she was innocent and revealing that she had passed a polygraph examination.

{¶ 49} Respondent did not merely comment on Sandlin's case, in which she was ultimately convicted of felony counts for tampering with evidence and forgery. He made those comments knowing that they were misleading, if not false. In a previous discussion with Magistrate Williams, respondent had acknowledged that although the polygraph results suggested that Sandlin had answered truthfully, he was aware that deficiencies in administering the polygraph test rendered the results unreliable and meaningless.

{¶ 50} Respondent admits that his statements were improper, but maintains that the press release was not harmful to the administration of justice and did not create any appearance of injustice or bias in Sandlin's case, noting that she was eventually convicted. Again, we are not convinced. Williams's entry assessed costs against both Sandlin and her ex-husband. Sandlin altered the entry to charge costs solely to her ex-husband. Sandlin had the opportunity and incentive for the forgery, and respondent conceded this to law enforcement, along with the fact that the writing resembled Sandlin's. Yet, despite the gravity of the offense and the signs of Sandlin's guilt, respondent made a public statement implying Sandlin's innocence, using the force of his office in such a way that the public would be swayed and potential jurors possibly prejudiced. We doubt that respondent could have failed to appreciate that his press release would have that effect.

{¶ 51} By suggesting Sandlin's innocence of criminal charges in a public statement prior to her trial, respondent commented on a pending case and possibly swayed potential jurors with his out-of-court statements. He thereby violated Canon 3(B)(9) and DR 1–102(A)(5).

### C. Counts II and III: Respondent's Failure to Disqualify Himself When Presiding over Cases Involving His Assistant or Her Son

{¶ 52} As to Counts II and III, respondent admits that he violated Canon 3(E)(1) by failing to disqualify himself first in a criminal case against Jamie Lykins, Sandlin's son, and also in a foreclosure action against Sandlin and her husband. He submits, however, that these are merely technical violations and that he did not also violate Canons 1, 2, and 4, as found by the board relative to Counts II and III, or DR 1–102(A)(5), as found by the board in Count II. While these are not as serious as respondent's earlier ethical breaches, we agree with the board and find that respondent's acts constituted misconduct.

{¶ 53} In July 2004, respondent presided over Lykins's felony prosecution for possession of a controlled substance. Despite employing Lykins's mother and despite having defended Lykins in private practice, respondent did not recuse himself. He instead disclosed his relationship to Lykins first privately in response to counsel's request that he remain on the case and later in open court. When neither party's counsel objected, respondent accepted Lykins's guilty plea. Respondent sentenced Lykins to three years of community control, including a treatment program, granted an extension of his furlough, granted a four-month stay of his sentence, and granted him driving privileges. Respondent eventually terminated the stay of sentence and ordered Lykins's arrest for violating community-control conditions.

{¶ 54} In March 2005, a mortgage company filed a foreclosure action against Sandlin and her husband. The couple answered pro se but then failed to oppose a motion for summary judgment, and respondent granted the motion. This time, respondent did not disclose his connection to Sandlin at all prior to ruling.

{¶ 55} Under Canon 3(E)(1), a judge must disqualify himself or herself in cases where the judge's impartiality might reasonably be questioned. No one disputes that Sandlin's employment together with her son's relationship with respondent invoked that duty in both Sandlin's foreclosure case and her son's felony case. Canon 3(F), however, allows a disqualified judge to proceed notwithstanding initial recusal in some circumstances:

{¶ 56} "If, following disclosure of any basis for disqualification other than personal bias or prejudice concerning a party, the parties and lawyers, without participation by the judge, jointly request that the judge should remit his or her disqualification, the judge *may approve* and participate in the proceeding. The

request and approval shall be incorporated in the record of the proceeding." (Emphasis added.)

{¶ 57} Thus, provided that the judge has no personal bias, Canon 3(F) allows the judge to preside after recusal if (1) the parties have jointly requested on the record that the judge remit the disqualification *and* (2) the judge approves of remittal, also on the record. To properly proceed, then, respondent should have first recused himself to allow the parties unfettered opportunity to decide whether to ask for remittal and weigh the propriety of going forward, and then remit his disqualification only after a proper joint request. Respondent did not follow either part of this procedure and thereby perpetuated the perception that he might favor Sandlin or her son in his deliberations, in violation of Canon 3(E)(1) in both Counts II and III.

{¶ 58} As to the Lykins prosecution, respondent argues that he substantially complied with the procedure in Canon 3(F) when he was approached by both counsel, who requested that he preside despite his connection to Lykins and his mother, and when he reiterated his connection in open court and obtained the consent of both parties on the record to his continuing to preside. He argues that this method sufficiently protected the interests at stake. This loose approximation of the proper procedure, however, does not afford the parties and counsel a real chance to seek another judge without risking offense to respondent. Moreover, even if the participants did consent, respondent was still obligated to comply with other Canons, including avoiding any appearance of partiality in granting relief to Lykins, given his obvious connection to Sandlin. By failing to conduct this inquiry, respondent created an appearance of impropriety in violation of Canon 4 and further violated Canons 1 and 2 by failing to uphold the integrity and independence of the judiciary and to promote public confidence in the justice system. Moreover, this conduct violated DR 1–102(A)(5) by prejudicing the administration of justice.

{¶ 59} For the same reasons, respondent's failure in Sandlin's mortgage foreclosure case to disclose their relationship on the record and to then recuse himself is at least as objectionable. Though he ruled against Sandlin and thus did not act on any perceived bias, the perception of possible bias remained. Respondent thus again violated Canons 1, 2, and 4.

### D. Counts V and VI: Respondent's Improprieties in Overseeing Two Estates

{¶ 60} Counts V and VI arose out of respondent's mishandling of the estates of Harold Pavey Jr. (Count V) and Taylor Pavey (Count VI), respondent's uncle and cousin. Beginning while he was still in private practice, respondent was the executor of Harold's estate, and from 1999 until the appointment of successor counsel in July 2005, he also served as attorney for the estate. Respondent was

the administrator of Taylor's estate and served as its attorney from 1995 through 2003, when he was again succeeded by other counsel.

{¶ 61} The board described respondent as having an "absolute disregard of his fiduciary duties to the estate," and this apt characterization applies equally to both counts. Respondent, for example, never filed an estate account with the probate court in Harold's estate and filed just one in Taylor's. Both omissions violate R.C. 2109.301(B)(4), which requires a fiduciary to file an account within 13 months of appointment and annually thereafter.

{¶ 62} Respondent admits these violations as well as most of the considerable misconduct alleged. In acts common to both counts, respondent admits that he (1) took attorney fees from both estates before filing a final account, in violation of local rules of court, (2) took attorney fees from the estates without prior probate court approval, in violation of local rules of court, (3) used estate assets to directly pay personal debts, (4) used debit slips to withdraw funds from the estates without recording the purpose of those withdrawals, (5) did not keep complete and accurate records of the estates' assets, (6) failed to keep contemporaneous records of his services and time as an attorney and fiduciary, (7) mischaracterized transactions, fees, and expenses in a manner financially advantageous to him, (8) did not close the estates in a timely manner, and (9) failed to timely respond to requests for further information and documentation from the probate court and successor counsel.

{¶ 63} The financial consequences of these acts and omissions were significant. With respect to Count V, respondent paid $11,274.99 in estate assets directly to his personal creditors. An additional $20,786.80 in withdrawals from the estate remains unexplained. With respect to Count VI, respondent withdrew over $33,000 from estate funds with no documentation as to the purpose of these transactions. Attorney fees for the two estates totaled $43,761.68, and fiduciary fees totaled $20,868.18.

{¶ 64} In addition to the financial component, respondent's misconduct involved inordinate periods of noncompliance with statutory requirements and court directives. Respondent took *seven years* to respond to the probate court's request for time records in Taylor's estate. Moreover, he never complied with his duty to keep contemporaneous time records in either estate, nor did he ever satisfy his statutory duty to file yearly accounts. On the one occasion that respondent actually repaid the estate for improperly withdrawing funds, he delayed the repayment for years. Most of the remaining improper, undocumented withdrawals were later reported by respondent as either attorney or fiduciary fees. Respondent has never made any attempt to repay the excessive fees he charged to the estate.

{¶ 65} Respondent concedes that he violated DR 1–102(A)(5), 1–102(A)(6), 6–101(A)(3), and 9–102(B)(3) as to both Counts V and VI. He does contest the board's finding that he acted dishonestly in violation of DR 1–102(A)(4) by mishandling both estates. In light of the evidence and respondent's admissions, we find violations of all these rules. In his defense, respondent claims that his actions stemmed from neglect or inadvertence and were not motivated by any nefarious intent. We are not persuaded.

{¶ 66} Respondent's misconduct did not consist of isolated incidents of inattention. To the contrary, his acts and omissions demonstrate a pattern of conduct too extensive to be characterized as accidental, inadvertent, or merely neglectful. Respondent did not make an undocumented withdrawal from estate funds just once. He made 26 such withdrawals. He did not make just one debit withdrawal from estate funds. He did so at least 20 times. Respondent did not use estate assets to directly pay his personal creditors just once, but at least 16 times. Last, respondent did not just once pay himself attorney fees without probate court approval; he did so five times relative to Count V and paid himself over $25,000 in fees without authority relative to Count VI.

{¶ 67} Similarly, respondent's accounts and recordkeeping are not characterized by a merely occasional error or inaccuracy. The few records that respondent did keep were rife with inaccuracies and omissions.

{¶ 68} In light of the overwhelming evidence before us, we agree with the board's conclusion that respondent's acts were conscious and deliberate and committed with the intent of deceiving his clients, the probate court, and successor counsel. There can be no other reason for respondent's repeated use of debit withdrawals, rather than the estate checkbook, to remove funds. The same is true with respect to respondent's failure to file accounts and timely comply with requests for further documentation. These actions furthered one purpose—to help respondent evade detection of his unauthorized use of estate assets. We accordingly concur in the board's conclusion that respondent further violated DR 1–102(A)(4) in both Counts V and VI.

{¶ 69} Respondent also objects to the board's finding that his attorney fees relative to Count VI were clearly excessive and in violation of DR 2–106(A). He claims that because none of the Pavey heirs objected to the fees he awarded himself, there is no basis for a finding of excessiveness. We disagree.

{¶ 70} Respondent, as we have seen, did not keep contemporaneous time records, so his attempts to create records years later from memory were necessarily speculative and unreliable. Attorney Michael Murman reviewed those records and testified as an expert witness for relator. Murman pointed out numerous defects and inconsistencies, including, for instance, the fact that respondent reported 45 hours that were attributable to successor counsel as his

own work. He further testified that respondent's time records contained duplicative entries and that at least one entry should have been billed at a paralegal's rather than an attorney's rate. In Murman's opinion, respondent's records justified, at most, a fee of no more than $12,000. Viewing these facts cumulatively, we find that the board properly found an unjustified and excessive fee.

{¶ 71} Finally, because respondent continued in his capacity as attorney for the estates after he became a common pleas judge, judicial Canons are invoked. We adopt the board's finding that respondent's conduct also violated Canons 1, 2, and 4, as to each count.

### E. Count VIII

{¶ 72} Donald Scott Shaffer was indicted in 2002 on a charge of sexual conduct with a minor. Respondent presided over Shaffer's case.

{¶ 73} On January 14, 2004, respondent accepted Shaffer's guilty plea to a misdemeanor charge of sexual imposition. Respondent sentenced Shaffer to 60 days' incarceration, with 50 days suspended. Shaffer was to serve the balance of his sentence starting February 13, 2004.

{¶ 74} Shaffer's cousin is Roger Dillard, a good friend of respondent who lunched with respondent regularly. During lunch on or near February 19, 2004, respondent and Dillard had some discussion about Shaffer. Almost immediately after their conversation, respondent suspended the balance of Shaffer's sentence.

{¶ 75} Respondent admits that his lunch with Dillard prompted him to suspend all Shaffer's sentence but denies that Dillard asked him to do so. Respondent claims that their conversation caused him to rethink the legality of Shaffer's sentence given certain changes in the sentencing statutes. Respondent testified that after giving the matter some thought, he concluded that the sentence was unlawful and he needed to "correct it immediately." The result was the entry suspending Shaffer's entire sentence.

{¶ 76} The suspension order indicated that respondent had acted "Upon Motion of the Defendant." But Shaffer never filed a motion contesting the legality of his sentence, and respondent now admits that he misrepresented the genesis of the order. He also admits that he never set the matter for hearing, and he does not dispute the board's assertion that neither the prosecutor nor defense counsel were served with a copy of the entry. Finally, respondent concedes that the original sentence was proper and that he was wrong about the possible invalidity of that sentence.

{¶ 77} Respondent asserted that his actions were not influenced by his friendship with Dillard, but the board was not convinced. Taking into account the irregularities already discussed, the board noted that no evidence suggested that respondent seriously reconsidered the legality of other misdemeanor sen-

tences that he had imposed around the time he suspended Shaffer's sentence. Testimony also established that when Magistrate Williams asked about Shaffer's release, respondent explained that Shaffer "had gotten sick at the jail and that Sheriff Ward had requested that he let him out so the County wouldn't have to pay his medical bills." Sheriff Richard D. Ward denied having made this statement, saying that if there had been such a situation, he would have contacted the prosecutor, not the presiding judge, to initiate the release.

{¶ 78} The board concluded that respondent had illegally released Shaffer from custody on Dillard's suggestion. The board thus found respondent in violation of DR 1–102(A)(4), (5), and (6) and Canons 1, 2, 4, and 4(A), which precludes a judge from allowing a family, social, political, or other relationship to influence the judge's judicial conduct or judgment. Because the evidence of these improprieties is so compelling, we concur in the board's findings of misconduct and adopt them as our own.

## II.  Sanction

{¶ 79} To determine the proper sanction to impose on respondent for his violations of the Code of Judicial Conduct and the Disciplinary Rules, we examine all pertinent factors, including the duties violated, respondent's mental state, the injury caused, the existence of aggravating or mitigating circumstances, and the applicable precedent. See *Disciplinary Counsel v. Parker,* 116 Ohio St.3d 64, 2007-Ohio-5635, 876 N.E.2d 556, ¶ 56. In applying this analysis to judges, we again recognize that " 'judges are held to higher standards of integrity and ethical conduct than attorneys or other persons not invested with the public trust.' " *Disciplinary Counsel v. O'Neill,* 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 57, quoting Shaman, Lubet & Alfini, Judicial Conduct and Ethics (3d Ed.2000) 2; see also *In re Coffey's Case* (N.H.2008), 949 A.2d 102, 114. ("Because they assume a heightened station in our society, judges must maintain a standard of personal and professional conduct above that expected of attorneys").

### A.  Duties Violated and Injuries Caused

{¶ 80} Respondent violated many duties owed under the Canons and the Disciplinary Rules, including duties to the public, DR 1–102(A)(4), (5), and (6), the legal system, DR 1–102(A)(5) and (6), his clients, DR 2–106(A), 6–101(A)(3), and 9–102(B)(3), and the judiciary and litigants. Canons 1, 2, 3, and 4 of the Code of Judicial Conduct.

{¶ 81} Respondent's misconduct caused incalculable harm to the public perception of the judiciary and attorneys. "It is of utmost importance that the public have confidence in the integrity and impartiality of the judiciary." *Disciplinary Counsel v. Allen* (1997), 79 Ohio St.3d 494, 495, 684 N.E.2d 31. Respondent

departed from acceptable practice in deciding cases involving his employee and his employee's son, he showed favoritism toward the cousin of a close friend, and he acted in a deceptive manner on many occasions, including in the estate cases and in his attempts to conceal his interest in the Fifth Third building and to sell the building to Bliss.

{¶ 82} Respondent's misconduct also harmed his clients. He charged his cousin's estate excessive legal fees without proper documentation or justification and improperly withdrew money from his uncle's estate that he did not repay until several years had passed.

{¶ 83} In sum, respondent's misconduct severely diminished the public perception of both the judiciary and the bar.

### B. Respondent's Mental State

{¶ 84} There is no evidence that respondent suffered from any mental disability or chemical dependency at the time he committed the numerous ethical violations in this case, and "thus we presume that he was healthy and unhindered in that regard." *Disciplinary Counsel v. Sargeant*, 118 Ohio St.3d 322, 2008-Ohio-2330, 889 N.E.2d 96, ¶ 31.

### C. Aggravating and Mitigating Circumstances

{¶ 85} We must next consider and weigh the aggravating and mitigating factors. See Section 10(B) of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg.").

{¶ 86} For aggravating circumstances, respondent's misconduct evidenced dishonest and selfish motives. Among other examples, he made a misleading public statement about his employee's indictment to defend his decision to continue her employment, concealed his purchase of a building to avoid a conflict-of-interest claim, withdrew estate assets before the preparation of the final account and without prior approval to pay his personal expenses, and tried to resolve his financial problems by selling the building he claimed not to own in exchange for money he knew to be stolen. His acts demonstrated a pattern of dishonest and deceitful conduct in the estate cases, in his purchase of the building and negotiation to sell it to a convicted felon, and in releasing a cousin of a close friend from jail. BCGD Proc.Reg. 10(B)(1)(b) and (c).

{¶ 87} Respondent also committed multiple offenses by violating both the Canons and the Disciplinary Rules. He submitted false evidence and false statements and was otherwise deceptive in the disciplinary process by claiming not to appreciate the effect of his public statement about his employee passing a polygraph test, that he had no interest of any kind in the Fifth Third building,

and that he had released his friend's cousin from jail because of doubts about the sentence and concern for potential liability to the county. He refused to acknowledge the wrongful nature of some of his conduct. For example, when confronted with the many instances of his inability to reconcile his testimony with certain documentary evidence, respondent testified that he signed the pleadings and affidavits without having read them. He also failed to make restitution by never repaying one of the estates an excessive legal fee he charged. BCGD Proc.Reg. 10(B)(1)(d), (f), (g), and (i).

{¶ 88} Moreover, respondent ignored others' efforts to persuade him to avoid some of the ethical violations established here. See *In re Coffey's Case* (N.H. 2008), 949 A.2d 102, 116 (in judicial disciplinary proceeding, court should determine whether judge was warned of impropriety of conduct and failed to heed those warnings); see also *In re King* (1991), 409 Mass. 590, 610, 568 N.E.2d 588. The magistrate advised respondent and he acknowledged that Sandlin's polygraph results were unreliable before respondent issued a press release stating that his employee had passed the examination, and he ignored the advice of Sheriff Ward and an F.B.I. agent he consulted to stay away from Bliss.

{¶ 89} In mitigation, respondent has no disciplinary record, and many people attested to his generally exemplary character and judicial temperament apart from the events at bar. BCGD Proc.Reg. 10(a) and (e). He also acknowledged some of his wrongful conduct. We agree with the board, however, that respondent's lengthy delay in repaying one estate the over $8,000 in debit withdrawals he had made without supporting documentation "minimized the [mitigating] impact of the voluntary payment."

{¶ 90} In assessing these factors, we find that the breadth and severity of the aggravating factors overwhelmingly outweigh the minimal mitigation established by respondent.

### III. Applicable Precedent

{¶ 91} Respondent's "pervasive conduct of misrepresentation in violation of DR 1–102(A)(4) by itself warrants an actual suspension from the practice of law for an appropriate period of time." *O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 52. In addition, we have held in a disciplinary case involving an attorney's mishandling of two estate matters, "A sanction of at least an indefinite suspension is warranted for misconduct that involves violations of DR 1–102(A)(4), 1–102(A)(5), 6–101(A)(3), and 9–102(B)." *Butler Cty. Bar Assn. v. Bradley* (1999), 87 Ohio St.3d 213, 214–215, 718 N.E.2d 1272; see also *Butler Cty. Bar Assn. v. Green* (1982), 1 Ohio St.3d 48, 1 OBR 92, 438 N.E.2d 406 (attorney's withdrawal of money from estate checking account without prior agreement of client constituted conversion of client's funds for personal use of attorney in violation of, among other rules, DR 1–102(A)(4), (5), and (6), and warranted

indefinite suspension). This case involves many violations in addition to the foregoing violations.

{¶ 92} To be sure, we reserve the ultimate sanction of permanent disbarment for the most egregious misconduct. Consequently, we have disbarred judges and former judges based on felony convictions. See, e.g., *Disciplinary Counsel v. Gallagher* (1998), 82 Ohio St.3d 51, 53, 693 N.E.2d 1078 (federal conviction for distributing cocaine) ("When a judge's felonious conduct brings disrepute to the judicial system, the institution is irreparably harmed"); *Disciplinary Counsel v. Mosely* (1994), 69 Ohio St.3d 401, 632 N.E.2d 1287 (federal conviction for multiple counts of interference with commerce by extortion and state conviction for multiple counts of grand theft and theft in office).

{¶ 93} But permanent disbarment of judges or attorneys for misconduct committed during service as a judge is not confined to misconduct that has resulted in a criminal conviction. See, e.g., *Cleveland Bar Assn. v. Katalinas* (2000), 90 Ohio St.3d 140, 735 N.E.2d 432, where we permanently disbarred an attorney for misconduct involving violations of the Code of Judicial Conduct and the Disciplinary Rules during the time he was a municipal court judge, even though the facts did not reveal any criminal conviction for the respondent; see also Rotunda and Dzienkowski, Legal Ethics: The Lawyer's Deskbook on Professional Responsibility (2006) 1231, Section 10.2–4(a) ("It is not necessary that a judge be first convicted of violating the law before he can be disciplined" for violating the Code of Judicial Conduct).

{¶ 94} This sanction is consistent with our precedent that in both judicial and attorney disciplinary proceedings, the standard of proof is "clear and convincing evidence" rather than the "proof beyond a reasonable doubt" standard required in criminal cases. *Ohio State Bar Assn. v. Reid* (1999), 85 Ohio St.3d 327, 331, 708 N.E.2d 193. Therefore, the mere fact that respondent has not been convicted of any criminal offense relating to this misconduct does not preclude disbarment.

{¶ 95} We are persuaded that the ultimate sanction of permanent disbarment is warranted here. In addition to his improper public comment, failure to recuse himself, and favoritism, respondent has engaged in a pattern of serious misconduct, including deceit, conversion of funds for his personal use, and hiding his interests in and then trying to sell a building in exchange for laundered money. His misconduct as both a judge and an attorney spanned a protracted period of over ten years, with much of it occurring after respondent had become judge. Clearly, these violations were not isolated incidents in an otherwise unblemished legal career.

{¶ 96} The persistent, serious, and varied nature of respondent's malfeasance establish that only the full measure of our disciplinary authority can protect the public and restore the integrity of the judiciary and the bar, particularly given

the principle that judges must be held to the highest standards of integrity and ethical conduct. Therefore, respondent is permanently disbarred from the practice of law in Ohio. Costs taxed to respondent.

*Judgment accordingly.*

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, and CUPP, JJ., concur.

LANZINGER, J., concurs in judgment only.

--------

Jonathan E. Coughlan, Disciplinary Counsel, for relator.

Montgomery, Rennie & Jonson, George D. Jonson, and Kimberly Vanover Riley, for respondent.