Disciplinary Counsel *v.* Heiland.

[Cite as *Disciplinary Counsel v. Heiland,*
116 Ohio St.3d 521, 2008-Ohio-91.]

(No. 2007–1111—Submitted September 19, 2007—Decided January 17, 2008.)

**Per Curiam.**

{¶ 1} Respondent, Eric K. Heiland of Lorain, Ohio, Attorney Registration No. 0056083, was admitted to the Ohio bar in 1991. On March 9, 2007, relator, Disciplinary Counsel, filed an amended complaint charging respondent with several violations of the Code of Professional Responsibility. Respondent answered the amended complaint, and a panel of the Board of Commissioners on Grievances and Discipline held a hearing on March 29 and 30, 2007. The panel then made findings of fact, conclusions of law, and a recommendation, which the board adopted.

{¶ 2} The Board of Commissioners on Grievances and Discipline recommends that we impose an indefinite suspension of respondent's license to practice law based on findings that he committed several disciplinary violations. On review, we adopt the board's findings of misconduct and the recommended sanction.

### Misconduct

*Count Two*

{¶ 3} On January 2, 1998, respondent filed a complaint in the Lorain County Court of Common Pleas on behalf of his wife, Patricia Heiland, her sister, Faye Happel, and Patricia and Faye's parents, Emmitt and Catherine Holbrook. Respondent sought to enjoin Royal Manor Health Care from discharging Catherine Holbrook from Palm Crest West Nursing Home for nonpayment of fees.

{¶ 4} In the complaint, respondent asserted that Catherine Holbrook was "incompetent." Respondent also attached an affidavit from his wife that stated: "My mother Catherine Holbrook has a diagnosed medical condition of suspected Alzheimer's disease which is so advanced that she does not understand who or where she is * * *."

{¶ 5} On January 31, 1998, 29 days after filing the complaint describing Catherine Holbrook as incompetent, respondent witnessed a document signed by Catherine Holbrook purporting to grant respondent's wife power of attorney to act on behalf of Catherine Holbrook.

{¶ 6} The board found that respondent's actions violated DR 1–102(A)(6) (prohibiting conduct that adversely reflects on a lawyer's fitness to practice law).

## Count One

{¶ 7} As discussed in Count Two, Catherine Holbrook purportedly granted power of attorney to her daughter, respondent's wife, on January 31, 1998. On February 4, 1998, Emmitt Holbrook also granted power of attorney to respondent's wife. During this time, Catherine Holbrook's income consisted of a pension from the State Teachers Retirement System, and Emmitt Holbrook's income consisted of a Ford Motor Company pension and Social Security benefits.

{¶ 8} Between 1998 and 2001, respondent, with his wife's assistance, deposited Catherine Holbrook's pension checks and Emmitt Holbrook's pension and Social Security checks, into his client trust account. Respondent also deposited some of his wife's earnings from Grace United Methodist Church into his trust account. During this time, respondent deposited a total of $68,917.79 into his trust account, with approximately $40,000 coming from his in-laws' retirement funds and insurance benefits and from his wife's employment checks.

{¶ 9} Between 1998 and 2001, respondent wrote 292 checks from his trust account. Of these 292 checks, 262 were payable to cash. These totaled $60,195, but respondent has no records accounting for this money. At the hearing, respondent testified that he cashed the checks and gave the money to his wife as attorney-in-fact for her parents.

{¶ 10} Emmitt Holbrook resided at Anchor Lodge Retirement Village from February 1995 to February 1999. After obtaining power of attorney from Emmitt in February 1998, respondent's wife wrote four checks to Anchor Lodge, totaling $9,162, that were returned for insufficient funds. After repeated attempts to collect the debt, Anchor Lodge caused criminal charges to be filed against respondent's wife for passing bad checks. The charges were dismissed after respondent paid Anchor Lodge $4,141.86 by a check drawn on his trust account.

{¶ 11} Emmitt Holbrook next resided at the Community at Parkvue from February 5, 1999, to January 6, 2000. Respondent's wife acted as Emmitt's attorney-in-fact during this time and assumed financial responsibility for his care. During Emmitt's stay at Parkvue, respondent wrote 92 checks on his trust account, with 87 checks payable to cash. The 87 checks totaled $28,530.86. Respondent, however, could not account for any of the money he received when

he negotiated these checks, except to say that he gave the cash to his wife to be used for the Holbrooks' care. Yet none of the cash withdrawals made by respondent had been used to pay Parkvue. When Parkvue discharged Emmitt Holbrook on January 6, 2000, Parkvue was owed over $53,000.

{¶ 12} On May 5, 2000, Emmitt Holbrook was admitted to Avon Oaks Nursing Home. Respondent continued to deposit Emmitt Holbrook's pension checks and Social Security benefits into his trust account while Emmitt resided at Avon Oaks. From May until December 2000, respondent wrote 86 checks on his trust account payable to cash for a total of $20,306.62. Respondent cannot account for any of the money withdrawn, except to say that the cash was given to his wife to be used for the Holbrooks' care. None of this money was paid to Avon Oaks, and by November 2000, Emmitt Holbrook owed over $29,000 in fees to Avon Oaks.

{¶ 13} On June 5, 2002, the Lorain County Grand Jury indicted respondent on three counts of felony theft. The charges involved respondent's participation in a scheme to defraud his in-laws, Emmitt and Catherine Holbrook, and various nursing homes that had provided care for the Holbrooks from January 31, 1998, to April 30, 2001. On February 14, 2005, respondent entered an *Alford* guilty plea[1] to three misdemeanor counts of defrauding creditors.

{¶ 14} Based on the foregoing, the board concluded that respondent had used his client trust account to launder money from the Holbrooks' retirement funds. The board found that by depositing the Holbrooks' retirement income into his trust account and doling out the money in cash to his wife, respondent and his wife were able to keep this money from the nursing homes and Medicaid. The board also found that respondent had overdrawn his trust account on four separate occasions in August 1998.

{¶ 15} Based on respondent's conduct, the board found that he had violated DR 1–102(A)(3) (prohibiting conduct involving moral turpitude), 1–102(A)(4) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation), 1–102(A)(5) (prohibiting conduct that is prejudicial to the administration of justice), 1–102(A)(6) (prohibiting conduct that adversely reflects on a lawyer's fitness to practice law), and 9–102(B)(3) (requiring the lawyer to maintain complete records of all funds, securities, and other properties of a client coming into the lawyer's possession and render appropriate accounts to his client regarding them).

## Count Three

{¶ 16} Relator charged respondent with violating DR 1–102(A)(4) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation) based on the

---

1. *North Carolina v. Alford* (1970), 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162.

fact that respondent's client trust account was entitled "Legal Aid Trust Account/State of Ohio/Eric K. Heiland."

{¶ 17} The board found that respondent's conduct violated DR 1–102(A)(4) because he had no affiliation with Legal Aid or any other government-subsidized legal-services organization.

### Count Four

{¶ 18} During respondent's deposition on December 15, 2006, relator requested that respondent provide his federal income tax returns for the years 1999, 2000, and 2001. Respondent agreed to provide the returns, but failed to do so.

{¶ 19} On January 5, 2007, and again on February 7, 2007, the panel chair ordered respondent to provide his tax returns. Respondent has not produced his federal tax returns and at the hearing refused to answer questions regarding their production.

{¶ 20} The board found that respondent's conduct violated Gov.Bar R. V(4)(G) (failure to cooperate in a disciplinary investigation).

### Recommended Sanction

{¶ 21} In recommending a sanction, the board considered the aggravating and mitigating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg.").

{¶ 22} As aggravating factors, the board found that respondent had acted with a dishonest or selfish motive. BCGD Proc.Reg. 10(B)(1)(b). In addition, the number of violations showed a pattern of misconduct involving multiple offenses. BCGD Proc.Reg. 10(B)(1)(c) and (d). The board also noted that respondent had failed to cooperate fully in the disciplinary process and that he had submitted false evidence, made false statements, and engaged in other deceptive practices during the disciplinary process. BCGD Proc.Reg. 10(B)(1)(e) and (f). Finally, the board found that respondent refused to acknowledge the wrongful nature of his misconduct and that the victims of his misconduct had suffered harm. BCGD Proc.Reg. 10(B)(1)(g) and (h).

{¶ 23} In mitigation, the board noted that respondent had no prior disciplinary record. BCGD Proc.Reg. 10(B)(2)(a). Respondent has also been sentenced for his misdemeanor conviction of defrauding creditors. BCGD Proc.Reg. 10(B)(2)(f).

{¶ 24} Relator recommended that respondent receive a two-year suspension for his misconduct. Respondent asked that any suspension imposed be stayed. The panel recommended that respondent be indefinitely suspended from the practice

of law. The board adopted the panel's recommendation of an indefinite suspension.

## Review

{¶ 25} Respondent raises three objections to the board's findings of misconduct and recommended sanction. Respondent contends that the board erred in denying his Fifth and Fourteenth Amendment claims in relation to Count Four and the sanction imposed. Respondent also challenges the board's finding of a violation of DR 1–102(A)(4) in Count Three. Finally, respondent claims that the board erred in recommending an indefinite suspension of his license to practice law.

{¶ 26} *Fifth Amendment Self–Incrimination Clause.* Respondent first maintains that the board was precluded from finding a violation of Gov.Bar R. V(4)(G) (failure to cooperate) because respondent invoked his Fifth Amendment right against self-incrimination. Respondent relies on *Spevack v. Klein* (1967), 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574, to support this claim.

{¶ 27} *Spevack* involved a New York state attorney who was disbarred because he refused to provide financial records and testify at the disciplinary proceeding. The attorney's sole defense was that the production of records and his testimony would tend to incriminate him. The New York Supreme Court, Appellate Division, held that the Fifth Amendment privilege against self-incrimination was not available to the attorney and disbarred him. The New York Court of Appeals affirmed. Id. at 512–513, 87 S.Ct. 625, 17 L.Ed.2d 574.

{¶ 28} The United States Supreme Court reversed. The lead opinion stated that "the Self–Incrimination Clause of the Fifth Amendment has been absorbed in the Fourteenth, that it extends its protection to lawyers as well as to other individuals, and that it should not be watered down by imposing the dishonor of disbarment and the deprivation of a livelihood as a price for asserting it." *Spevack*, 385 U.S. at 514, 87 S.Ct. 625, 17 L.Ed.2d 574 (Douglas, J.; plurality opinion).

{¶ 29} We find that respondent's reliance on *Spevack* is misplaced. In *Spevack*, four justices stated that an attorney could not be disbarred solely for exercising his Fifth Amendment privilege, and a fifth justice explained a limited exception. Other than Spevack's refusal to produce the documents and testify, there were no charges of misconduct at issue. *Spevack*, 385 U.S. at 517–519 and 512–513, 87 S.Ct. 625, 17 L.Ed.2d 574. In contrast, beyond the failure-to-cooperate violation in Count Four, respondent was charged in three counts with seven separate disciplinary violations. Thus, unlike the attorney in *Spevack*, respondent was not sanctioned solely on the basis of the invoking of his Fifth Amendment privilege.

{¶ 30} Moreover, respondent did not invoke his Fifth Amendment privilege until his hearing before the panel. He had previously agreed to provide his tax returns to relator but failed to do so. Thus, respondent's right against self-incrimination was not violated, because his failure to cooperate stemmed from events occurring before he invoked his Fifth Amendment privilege.

{¶ 31} *Due Process.* Respondent also claims that his right to due process was violated when the relator was allowed to amend his complaint. On March 9, 2007—20 days before the scheduled hearing—relator filed a motion to amend his complaint. On March 13, 2007, the panel chair granted relator's motion. Respondent now complains that the relator was allowed to amend its complaint less than 30 days before the hearing and respondent was given less than 20 days to answer the amended complaint.

{¶ 32} "The standards of due process in a disciplinary proceeding are not equal to those in a criminal matter. * * * A disciplinary proceeding is instituted to safeguard the courts and to protect the public from the misconduct of those who are licensed to practice law, and is neither a criminal nor a civil proceeding." *In re Judicial Campaign Complaint Against Carr* (1996), 76 Ohio St.3d 320, 322, 667 N.E.2d 956. Nevertheless, because of the severity of the sanctions available for violations of the Disciplinary Rules, a respondent's due process rights must be carefully balanced against the importance of the public interest in expeditiously resolving complaints of misconduct. See, generally, id.

{¶ 33} Other than a blanket assertion that he had less than the time allotted to respond to a formal complaint, respondent offers no evidence or argument that he was prevented from asserting an adequate defense to the amended complaint. For instance, respondent does not claim that the issue raised in the amended complaint was overly complex or that he had difficulty obtaining evidence to refute the allegation. Indeed, the sole claim added to the amended complaint involved respondent's failure to cooperate, and the issue was straightforward and simple and required little preparation.

{¶ 34} Moreover, although Gov.Bar R. V(6)(E) provides a respondent with 20 days to answer a complaint, there is no such requirement for an amended complaint. Rather, Gov.Bar R. V(11)(D) states that complaints may be amended at any time prior to final order of this court and that the party affected by the amendment "shall be given reasonable opportunity to meet any new matter presented." Respondent had ample opportunity to respond to the additional claim and, in fact, did file an answer to the amended complaint on the day of the hearing. Gov.Bar R. V and the regulations relating to investigation and proceedings involving complaints of misconduct are to be construed liberally for the protection of the public, the courts, and the legal profession. In sum, we find that respondent's due process rights were not violated.

{¶ 35} Respondent also maintains that the relator was allowed to amend his complaint outside the time frame permitted by the Rules for the Government of the Bar without an explicit showing of good cause. We disagree.

{¶ 36} "The relator may not amend the complaint within thirty days of the scheduled hearing without a showing of good cause to the satisfaction of the panel chair." BCGD Proc.Reg. 9(D). In December 2006, relator requested that respondent provide his federal income tax returns. Respondent agreed to provide the returns, but failed to do so. The panel chair also ordered respondent to provide his tax returns on two separate occasions. Yet respondent failed to produce the returns after again assuring the relator that he would. We find that respondent's failure to comply—coupled with his assurances that he would—provided good cause for the panel chair to grant the motion within 30 days of the hearing.

{¶ 37} *DR 1–102(A)(4).* The board found that respondent had violated DR 1–102(A)(4) when he titled his client trust account "Legal Aid Trust Account—State of Ohio." DR 1–102(A)(4) provides that a "lawyer shall not * * * [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation." The board apparently concluded that the account was misleading because respondent had no affiliation with Legal Aid or any other government-subsidized legal-services organization.

{¶ 38} At the hearing, respondent testified that he had been instructed by a bank employee to title the trust account in this manner. Respondent asserts that the board erred in finding a violation of DR 1–102(A)(4) "without any requisite purpose, knowledge, or intent."

{¶ 39} We will defer to a panel's credibility determinations in our independent review of discipline cases unless the record weighs heavily against those determinations. *Cincinnati Bar Assn. v. Statzer,* 101 Ohio St.3d 14, 2003-Ohio-6649, 800 N.E.2d 1117, ¶ 8. Respondent has offered no corroborating evidence that would support this claim. In light of the board's findings that respondent had submitted false evidence and statements, and guarded and misleading testimony, we find that this violation is supported by clear and convincing evidence.

{¶ 40} *Indefinite Suspension.* Respondent contends that the board erred in recommending an indefinite suspension of his license to practice law. Specifically, respondent challenges the board's reliance on *Disciplinary Counsel v. Wise,* 108 Ohio St.3d 381, 2006-Ohio-1194, 843 N.E.2d 1198.

{¶ 41} In *Wise,* we imposed an indefinite suspension on an attorney who had misused his client trust account over a period of years, had failed to maintain or produce adequate records documenting deposits and withdrawals, had multiple overdrafts from the trust account, and had failed to cooperate and was not candid during the disciplinary investigation. Id. at ¶ 16.

{¶ 42} Like the attorney in *Wise,* respondent misused his client trust account over a three-year period, overdrew the account on several occasions, commingled personal and client funds, failed to maintain adequate records, offered evasive testimony during the disciplinary hearing, and failed to cooperate fully in the disciplinary process.

{¶ 43} Nevertheless, respondent argues for a lesser sanction, pointing out that, unlike Wise, he had no previous discipline and that the overdrafts were limited to one month in 1998. Respondent's attempts to distinguish *Wise* miss the mark. Respondent overlooks the board's finding that he participated in a scheme to defraud various nursing homes that had provided for the care of his in-laws. In that sense, respondent's conduct is more egregious because—unlike the misconduct in *Wise*—respondent's misconduct caused financial harm to the victims of his misconduct. Cf. *Wise,* 108 Ohio St.3d 381, 2006-Ohio-1194, 843 N.E.2d 1198, ¶ 13.

{¶ 44} We stated in *Wise* that it is " 'of the utmost importance that attorneys maintain their personal and office accounts separate from their clients' accounts' and that any violation of that rule 'warrants a substantial sanction whether or not the client has been harmed.' " *Wise,* 108 Ohio St.3d 381, 2006-Ohio-1194, 843 N.E.2d 1198, ¶ 15, quoting *Erie–Huron Counties Joint Certified Grievance Commt. v. Miles* (1996), 76 Ohio St.3d 574, 577, 669 N.E.2d 831. We find that the board's recommended sanction is warranted. Respondent's extended misuse of his client trust account, the existence of substantial aggravating factors and little mitigating evidence, and the harm caused to his victims make it necessary to impose a suspension to protect the public.

## Conclusion

{¶ 45} Based on the foregoing, we find that each of respondent's objections to the board's report is without merit. After reviewing the board's record and its report, we agree that respondent violated DR 1–102(A)(3), 1–102(A)(4), 1–102(A)(5), 1–102(A)(6), and 9–102(B)(3) and Gov.Bar R. V(4)(G). We also accept the board's recommendation of an indefinite suspension. Respondent committed multiple violations showing a pattern of misconduct involving fraud and dishonesty. We find that respondent's pattern of misconduct, and the fact that he used his position as an attorney to defraud others, "makes respondent's wrongdoings particularly egregious." *Disciplinary Counsel v. Yajko* (1997), 77 Ohio St.3d 385, 387–388, 674 N.E.2d 684. Moreover, respondent compounded his misdeeds by refusing to acknowledge the wrongful nature of his misconduct and failing to cooperate fully and candidly in the disciplinary process.

{¶ 46} Accordingly, respondent is hereby indefinitely suspended from the practice of law. Furthermore, we order respondent to make restitution to the nursing homes that he defrauded. We therefore order the relator to produce evidence from the nursing homes within 30 days documenting the amount of

restitution owed. Respondent shall then pay restitution in that amount within six months of the filing of relator's evidence. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

———————————

Jonathan E. Coughlan, Disciplinary Counsel, and Joseph M. Caligiuri, Assistant Disciplinary Counsel, for relator.

Eric Kyle Heiland, pro se.