[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Cicero,* Slip Opinion No. 2014-Ohio-4639.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2014-OHIO-4639

DISCIPLINARY COUNSEL *v.* CICERO.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Cicero,* Slip Opinion No. 2014-Ohio-4639.]

*Attorneys—Misconduct—False statements to tribunal—Conduct involving dishonesty, deceit, or misrepresentation—Conduct prejudicial to administration of justice—Conduct adversely reflecting on fitness to practice law—Indefinite suspension.*

(No. 2013-1980—Submitted April 29, 2014—Decided October 23, 2014.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 2013-002.

_____

**FRENCH, J**.

{¶ 1} Respondent, Christopher Thomas Cicero of Columbus, Ohio, Attorney Registration No. 0039882, was admitted to the practice of law in Ohio in 1988. Relator, disciplinary counsel, has charged Cicero with making a false statement of law or fact to a tribunal, in violation of Prof.Cond.R. 3.3(a);

engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation, in violation of Prof.Cond.R. 8.4(c); engaging in conduct prejudicial to the administration of justice, in violation of Prof.Cond.R. 8.4(d); and engaging in conduct that adversely reflects on Cicero's fitness to practice law, in violation of Prof.Cond.R. 8.4(h).

{¶ 2}   This is Cicero's third time before the court on disciplinary charges. In 1997, we suspended Cicero from the practice of law for one year for engaging in conduct prejudicial to the administration of justice and failing to maintain a respectful attitude toward the courts, based on his insinuation to other attorneys, including his opposing counsel, that he was having a sexual relationship with a judge before whom he was practicing. *Disciplinary Counsel v. Cicero*, 78 Ohio St.3d 351, 678 N.E.2d 517 (1997).  In 2012, we again suspended Cicero for one year for violations of Prof.Cond.R. 1.18 (prohibiting a lawyer from revealing information learned during discussions with a prospective client) and 8.4(h), based on his disclosure of a potential client's confidential communications. *Disciplinary Counsel v. Cicero*, 134 Ohio St.3d 311, 2012-Ohio-5457, 982 N.E.2d 650.

{¶ 3}   Relator's single-count complaint here alleged that Cicero, after receiving a speeding ticket, obtained a blank, signed judgment entry from the arraignment-court judge, used the entry to unilaterally reduce his speeding charge to a headlight violation, and later falsely represented to the court and the prosecutor's office that a prosecutor had approved the reduction.  This alleged conduct occurred while Cicero's second disciplinary case was pending.

{¶ 4}   A panel of the Board of Commissioners on Grievances and Discipline heard testimony, reviewed the evidence, and made findings of fact and conclusions of law.  The panel found that Cicero had violated Prof.Cond.R. 3.3(a), 8.4(c), 8.4(d), and 8.4(h) and recommended an indefinite suspension of Cicero's license to practice law.  Upon review, the board amended the panel's

findings to add a specific finding that Cicero's conduct was sufficiently egregious to constitute a violation of Prof.Cond.R. 8.4(h). The board also modified the panel's recommendation and recommended permanent disbarment instead of an indefinite suspension.

{¶ 5} Cicero has filed an objection, challenging only the board's recommendation of permanent disbarment. For purposes of his objection, Cicero accepts the panel's findings of fact and conclusions of law, as modified by the board. For the following reasons, we sustain Cicero's objection.

**Misconduct**

{¶ 6} This case centers around Cicero's conduct in the Franklin County Municipal Court after receiving a speeding ticket in Columbus. Having handled a large number of traffic cases and having appeared in the municipal court on numerous occasions, Cicero was familiar with the judges, prosecutors, and policies of that court.

{¶ 7} On March 22, 2012, the day after receiving his speeding ticket, Cicero approached the municipal-court arraignment judge, Scott VanDerKarr. Cicero informed Judge VanDerKarr of his speeding ticket and obtained a blank, but signed, judgment entry. There is conflicting testimony as to what Cicero told Judge VanDerKarr. According to the judge, Cicero indicated that a prosecutor, who he identified by name, had offered him a reduction of his charge. But Cicero claims that he told the judge only that he was going to talk to an unnamed prosecutor. At the time, Cicero's speeding ticket had neither been filed with the court nor assigned a case number, and no prosecutor had offered to amend or reduce Cicero's speeding ticket. Cicero did not consult the arraignment-court prosecutor, Rob Levering, because he wanted to seek out a more "favorable" prosecutor.

{¶ 8} Following Cicero's instructions, his assistant, Tyler Carrell, filled in the blank judgment entry and filed it on April 3, 2012. The entry amended

Cicero's speeding violation to a headlight violation under R.C. 4513.04, an offense that carries no "points" and eliminated any danger of a license suspension. (Cicero had previously received approximately 50 speeding tickets, and his driver's license had twice been suspended as a result.) The amendment of a speeding infraction to an equipment violation was contrary to the city attorney's policy that all amendments relate to the original offense.

{¶ 9} Finding the April 3, 2012 judgment entry to be incomplete, as it did not include a finding of guilt, the clerk's office contacted Judge VanDerKarr's bailiff, Mike Basham. In an effort to correct the judgment entry, both Basham and Judge VanDerKarr contacted Cicero regarding the identity of the prosecutor who agreed to amend his citation, but Cicero refused to name a prosecutor. After his fruitless conversation with Cicero, Judge VanDerKarr issued a warrant for Cicero's arrest for contempt of court.

{¶ 10} Following his conversation with Judge VanDerKarr, Cicero drafted a letter to Lara N. Baker, the city attorney's chief prosecutor. Cicero's letter described the sequence of events as follows:

> I talked to one of your assistan[ts] and showed that person my ticket and asked whether or not I could amend it. * * *
>
> I then went to the [arraignment court] judge at the time which was Judge [VanDerKarr]. I informed him I had a speeding ticket that your office was willing to amend[.] * * *
>
> * * *
>
> [T]hat agreement made by your office was the only reason why * * * Judge VanDerKarr agreed to the amendment.

Cicero admits that he intentionally lied regarding the sequence of events described in his letter and that he did not have approval from a prosecutor when he approached Judge VanDerKarr.

{¶ 11} On April 5, 2012, Cicero appeared before Judge VanDerKarr on the arrest warrant, but refused to answer Judge VanDerKarr's direct requests for the name of the prosecutor who had offered to amend his speeding citation. Baker, who was also present, stated that she had spoken with all but three of her staff and that each staff member denied offering Cicero an amendment. One of the staff members Baker had not reached was former assistant prosecutor Brandon Shroy, whose last day of work at the city attorney's office was March 23, 2012. Upon Cicero's request for 24 hours to "talk to somebody," Judge VanDerKarr recessed the contempt hearing and allowed Cicero to post a $1,000 cash bond for his release. Judge VanDerKarr warned Cicero, "Tomorrow, if you don't give me a name, cash bond will be forfeited and you'll go to jail."

{¶ 12} Following the recess, Cicero approached Basham and identified Shroy as the prosecutor who made the offer. Cicero also called Shroy. According to Shroy, Cicero asked if he could use Shroy's name in connection with a ticket he had received, and Shroy told him no. Cicero, on the other hand, testified that he told Shroy that there was a problem with the amendment Shroy had given him and asked Shroy if he remembered the offer. Cicero testified that after leaving the arraignment courtroom on March 22, 2012, he had a 20-second conversation with Shroy and that Shroy authorized Cicero to amend his speeding ticket. Shroy denied that any such conversation had occurred.

{¶ 13} On April 6, 2012, before the contempt hearing resumed, Cicero spoke with Basham, who relayed to Judge VanDerKarr that Cicero had admitted that he did not have an offer when he approached Judge VanDerKarr in arraignment court. In court, Cicero denied making that statement and named Shroy as the prosecutor who authorized the reduction. But he again refused to

explain how the alleged plea offer came about. Judge VanDerKarr again continued the contempt hearing, revoked Cicero's bond, and remanded Cicero into custody. Cicero spent five days in jail.

{¶ 14} On April 10, 2012, Cicero appeared before Judge VanDerKarr with counsel, withdrew his plea to the headlight violation, and pleaded no contest to the original speeding violation. Cicero's attorney stated that Cicero recognized the delay caused by his failure to answer Judge VanDerKarr's questions and claimed that there had been a "fundamental misunderstanding" among Cicero, the prosecutor's office, and the court. Counsel relayed Cicero's "sincere[] apolog[y] for the inconvenience." Judge VanDerKarr cited Cicero for contempt and sentenced him to time served.

{¶ 15} Cicero does not challenge the board's findings that his conduct violated Prof.Cond.R. 3.3(a), 8.4(c), 8.4(d), and 8.4(h).

## Sanction

{¶ 16} When imposing sanctions for attorney misconduct, we consider the duties violated, the actual injury caused, the attorney's mental state, and sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. We also weigh the evidence of the aggravating and mitigating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). *Cleveland Bar Assn. v. Glatki*, 88 Ohio St.3d 381, 384, 726 N.E.2d 993 (2000).

{¶ 17} The panel noted the character testimony that Cicero offered in mitigation, but ultimately found a lack of mitigating factors. On the other hand, the panel found several aggravating factors. In addition to Cicero's prior disciplinary record, the panel found that Cicero had acted with a dishonest or selfish motive to avoid a suspension of his driver's license and, later, to protect his professional reputation. BCGD Proc.Reg. 10(B)(1)(a) and (b). The panel

6

found that Cicero engaged in a pattern of misconduct, considering both the conduct in this case and in his previous disciplinary cases. BCGD Proc.Reg. 10(B)(1)(c). The panel also found that Cicero had repeatedly refused to accept responsibility for his actions and relay the truth. BCGD Proc.Reg. 10(B)(1)(g). The panel concluded that Cicero's conduct demonstrated disrespect for the judicial system and warranted an indefinite suspension.

{¶ 18} In recommending permanent disbarment rather than the panel's recommended indefinite suspension, the board cited the following factors:

> (1) [Cicero's] repeated disciplinary violations; (2) the pattern of dishonesty and self-serving behavior that is prevalent throughout [Cicero's] disciplinary cases; (3) engaging in the misconduct that is the subject of this proceeding while his most recent disciplinary case was pending; (4) the Board's conclusion that [Cicero] is no longer fit to practice a profession grounded on trust, integrity, and candor; and (5) the Board's conclusion that disbarment is necessary to ensure the protection of the public.

{¶ 19} In cases involving multiple instances of misconduct, including a violation of Prof.Cond.R. 8.4(c), we impose an actual suspension. *Disciplinary Counsel v. Stafford*, 131 Ohio St.3d 385, 2012-Ohio-909, 965 N.E.2d 971, ¶ 67. Actual suspension is also warranted when an attorney exhibits a pattern of abusing legal procedures. *Id.* at ¶ 70. A lawyer's material misrepresentation to a court " 'strikes at the very core of [the] lawyer's relationship with the court and with the client. Respect for our profession is diminished with every deceitful act of a lawyer.' " *Id.* at ¶ 68, quoting *Disciplinary Counsel v. Fowerbaugh*, 74 Ohio St.3d 187, 190, 658 N.E.2d 237 (1995).

{¶ 20} Cicero does not address the possibility of an actual suspension. Instead, he urges this court to adopt the panel's recommendation of indefinite suspension in lieu of permanent disbarment. "[W]e reserve the ultimate sanction of permanent disbarment for the most egregious misconduct." *Disciplinary Counsel v. Hoskins*, 119 Ohio St.3d 17, 2008-Ohio-3194, 891 N.E.2d 324, ¶ 92. We have permanently disbarred attorneys upon proof of the attorney's "proclivity for lying and deceit." *Cincinnati Bar Assn. v. Farrell*, 129 Ohio St.3d 223, 2011-Ohio-2879, 951 N.E.2d 390, ¶ 34. But the ultimate sanction is not automatic in such cases. In *Stafford*, which involved "a course of conduct that was replete with dishonest, deceptive, and disrespectful acts," including false statements concerning the integrity of a judicial officer, we imposed only a 12-month suspension. *Id.* at ¶ 68-69, 80. We have also imposed partially or fully stayed suspensions in some cases involving dishonest, deceitful, or fraudulent conduct. *Id.* at ¶ 71. Cicero suggests that the misconduct in this case does not rise to the level of egregiousness required for permanent disbarment, and he stresses that his prior infractions did not involve matters affecting client relationships.

{¶ 21} In support of its recommendation of indefinite suspension, the panel cited *Disciplinary Counsel v. Frost*, 122 Ohio St.3d 219, 2009-Ohio-2870, 909 N.E.2d 1271, and *Columbus Bar Assn. v. Squeo*, 133 Ohio St.3d 536, 2012-Ohio-5004, 979 N.E.2d 321. The attorney in *Frost* filed false and baseless accusations of bias and corruption against county judges and a county prosecutor, leveled unfounded accusations of racial bias and other impropriety against a federal judge, and filed a baseless defamation action against her opposing counsel. This court agreed with the board that the attorney "committed acts of dishonesty, engaged in a pattern of misconduct, committed multiple offenses, and has failed to acknowledge the wrongfulness of her conduct." *Frost* at ¶ 37. While noting the eroding effect on public confidence of false statements impugning the integrity of judicial officers, the attorney's failure to inquire into

the truth of her allegations, and the attorney's ingrained pattern of resorting to improprieties, we imposed only indefinite suspension. *Id.* at ¶ 37-38, 41-42. We also indefinitely suspended the attorney in *Squeo*, who held himself out as an attorney while his license was suspended and did not cooperate in a disciplinary investigation. Aggravating factors included prior discipline, a selfish or dishonest motive, a pattern of misconduct, multiple offenses, failure to cooperate in the disciplinary process, vulnerability of and resulting harm to victims of the misconduct, and failure to make restitution. *Id.* at ¶ 18.

**{¶ 22}** In support of its recommendation of permanent disbarment here, the board cites *Farrell*, 129 Ohio St.3d 223, 2011-Ohio-2879, 951 N.E.2d 390. There, the Cincinnati Bar Association filed a complaint against an attorney who was already serving a two-year suspension for fabricating documents, forging his wife's signature on a power of attorney, lying to secure notarization of the power of attorney, and using the forged document to obtain credit. The bar association's complaint alleged that the attorney had failed to file tax returns, failed to pay tax liabilities, and filed a false affidavit in his domestic-relations proceedings. The attorney admitted the allegations and acknowledged violations of Prof.Cond.R. 8.4(b) (prohibiting a lawyer from committing an illegal act that reflects adversely on the lawyer's honesty or trustworthiness), (c), (d), and (h), but he objected to the board's recommendation for permanent disbarment. In overruling the objection, we found a lack of genuine remorse and stated that the attorney's "pattern of lying and deceit strongly suggests that he lacks the ability to conform his behavior to the ethical standards incumbent upon attorneys in this state." *Id.* at ¶ 35.

**{¶ 23}** The conduct alleged in *Farrell* overlapped and was intrinsically connected with the conduct underlying the attorney's prior disciplinary action. Both cases stemmed from the attorney's financial dishonesty in relation to his deteriorating relationship with his wife. The attorney's misconduct began in 2002, when he stopped filing income-tax returns and ceased making regular

estimated payments toward his income-tax liability. *Id*. at ¶ 7. Two years later, the attorney again undertook a "pattern of deception" that included the dishonest and fraudulent conduct underlying his first disciplinary case. *Id*. The panel found that the attorney "had engaged in a six-year pattern of pathological lying and deceptive conduct, acted with a premeditated intent to deceive the domestic-relations court, and submitted false testimony to another panel of the [b]oard." *Id.* at ¶ 22. Moreover, the attorney "continued to spin his web of lies" even while expressing remorse in his prior case. *Id.* at ¶ 33.

{¶ 24} This case is more akin to *Frost* and *Squeo* than *Farrell*. Like the attorneys in *Frost* and *Squeo*, Cicero has engaged in a pattern of dishonest conduct with selfish or dishonest motives, and, like those attorneys, he should face indefinite suspension. Unlike the continued deception linking the disciplinary violations committed by the attorney in *Farrell*, however, Cicero's disciplinary history involves three distinct matters. Cicero's prior disciplinary violations were not based on findings of dishonesty, misrepresentation, or fraud. Although a witness in Cicero's first disciplinary action testified that contrary to Cicero's testimony, Cicero's relationship with the judge had begun before the judge recused herself, the board concluded that disciplinary counsel failed to raise that issue in the complaint. 78 Ohio St.3d at 352, 678 N.E.2d 517. Although the panel in Cicero's second disciplinary case found his testimony " 'at times disingenuous and not credible,' " Cicero's violations there were not based on dishonest conduct, but on the revelation of confidential information from a prospective client. 134 Ohio St.3d 311, 2012-Ohio-5457, 982 N.E.2d 650, at ¶ 14, quoting the panel's report. The longstanding pattern of deceit present in *Farrell* is not present in this case.

{¶ 25} To be sure, Cicero's repeated disciplinary violations are troubling. But the mere fact that this is Cicero's third disciplinary sanction does not necessarily mean that his misconduct merits permanent disbarment. In *Columbus*

*Bar Assn. v. Boggs*, 129 Ohio St.3d 190, 2011-Ohio-2637, 951 N.E.2d 65, for example, this court ordered an indefinite suspension in an attorney's third disciplinary case, even though both his second and third involved the attorney's failure to keep accurate records of client money in his trust account and even though we found that the attorney had failed to rectify that unprofessional conduct after his second disciplinary sanction.

{¶ 26} By no means do we condone Cicero's dishonest, unprofessional, and censurable conduct, which was prejudicial to the administration of justice and which adversely reflects on Cicero's fitness to practice law. Nevertheless, in light of this court's precedent and considering all of the circumstances, including the aggravating factors and lack of significant mitigating factors, we do not find that Cicero's conduct, egregious though it may be, rises to the level for which we reserve the sanction of permanent disbarment. Instead, we determine that indefinite suspension is appropriate for Cicero's misconduct.

### Conclusion

{¶ 27} For these reasons, we indefinitely suspended Christopher Thomas Cicero from the practice of law in Ohio. Costs are taxed to Cicero.

Judgment accordingly.

PFEIFER, O'DONNELL, KENNEDY, and O'NEILL, JJ., concur.

O'CONNOR, C.J., and LANZINGER, J., dissent.

_____

**O'CONNOR, C.J., dissenting.**

{¶ 28} "[H]e who permits himself to tell a lie once, finds it much easier to do it a second and a third time, till at length it becomes habitual; he tells lies without attending to it, and truths without the world's believing him. This falsehood of the tongue leads to that of the heart, and in time depraves all its good dispositions." Thomas Jefferson, Letter to Peter Carr (Aug. 19, 1785), reprinted in 8 The Papers of Thomas Jefferson 406 (1953).

**{¶ 29}** I must dissent. The panel and board came to the well-founded conclusion that Cicero's version of events in this matter was wholly incredible. Cicero expressly accepted the board's findings of fact and conclusions of law in the objections he has filed with this court. Despite this, the majority appears to lend credence to certain aspects of Cicero's version of events and uses them to arrive at a conclusion that does not adequately recognize the insidiousness of Cicero's behavior.

**{¶ 30}** I must also disagree with the majority's logic in finding any substantive distinction between this case and *Cincinnati Bar Assn. v. Farrell*, 129 Ohio St.3d 223, 2011-Ohio-2879, 951 N.E.2d 390. Cicero's pattern of selfishly motivated, deceitful conduct soundly measures up to the level of misconduct in *Farrell* and is far worse than the misconduct in *Disciplinary Counsel v. Frost*, 122 Ohio St.3d 219, 2009-Ohio-2870, 909 N.E.2d 1271, *Columbus Bar Assn. v. Squeo*, 133 Ohio St.3d 536, 2012-Ohio-5004, 979 N.E.2d 321, and *Columbus Bar Assn. v. Boggs*, 129 Ohio St.3d 190, 2011-Ohio-2637, 951 N.E.2d 65. Given the egregiousness of Cicero's misconduct and the clear risk of recidivism, disbarment is the only appropriate sanction here. Anything less lowers our standards of ethical conduct for attorneys and further erodes the public's faith in the bar.

**{¶ 31}** Although we are not bound by the findings and conclusions of the panel and board, "[w]e will defer to a panel's credibility determinations in our independent review of discipline cases unless the record weighs heavily against those determinations." *Disciplinary Counsel v. Heiland,* 116 Ohio St.3d 521, 2008-Ohio-91, 880 N.E.2d 467, ¶ 39, citing *Cincinnati Bar Assn. v. Statzer,* 101 Ohio St.3d 14, 2003-Ohio-6649, 800 N.E.2d 1117, ¶ 8. The panel and board in this case found that Cicero was deceitful throughout the underlying matter, that he made "misrepresentations at almost every turn," and that his behavior during disciplinary proceedings was "inexcusable." Nothing has been offered to rebut these determinations. To the contrary, Cicero accepts them. Yet the majority

strays from the board's determinations, which were based on the credibility of Cicero and others, when determining the appropriate sanction in this case.

{¶ 32} The panel in this case unequivocally found that Cicero "never received an offer from a prosecutor to amend his traffic citation." It did not happen. Instead, Cicero strategically exploited the court system where he frequently worked in order to obtain a blank judgment entry. And he attempted to perpetrate a fraud on the court by unilaterally modifying the entry with no approval or even review by a prosecutor or judge and filing the entry with the clerk's office. After a simple error in the entry brought Cicero's fraud to light, he lied to Judge VanDerKarr and the entire prosecutor's office, claiming that an assistant prosecutor—who Cicero somehow could not name—had given him permission to amend his ticket. Cicero committed this falsehood to writing and submitted it to the court and the prosecutor's office.

{¶ 33} But the charade did not end there. Rather than admit to the wrongdoing, Cicero threw out a school of red herrings, ignored by the majority, in a transparent attempt to avoid being caught red-handed with a nonexistent prosecutor. Cicero made the following outlandish excuses for his lie while under oath: he could not tell Judge VanDerKarr who the assistant prosecutor was because (1) no one had told him what the problem was with the judgment entry, preventing him from understanding that he was being asked to identify the assistant prosecutor, (2) Cicero was only asked which name he had given to Judge VanDerKarr when he *initially* asked for the blank judgment entry, preventing Cicero from understanding that what the questioners actually wanted to know was which prosecutor had agreed to amend the ticket, (3) Judge VanDerKarr was so unreasonably angry that Cicero could not get a word in edgewise, (4) Cicero was secretly protecting the assistant prosecutor from a vindictive chief prosecutor, (5) he was secretly protecting Judge VanDerKarr from the chief prosecutor and apparently from Judge VanDerKarr himself, (6) he did not want to give Judge

VanDerKarr the satisfaction of having any information because the entire situation was Judge VanDerKarr's fault, (7) the questions were all happening so fast that he did not have the wherewithal to provide the assistant prosecutor's name, (8) some unnamed person or persons had asked Cicero "not to say anything." Cicero's quiver of untruths is notable for its depth, if nothing else.

{¶ 34} And moments after Cicero learned of information that made ex-assistant-prosecutor Brandon Shroy a convenient scapegoat, Cicero changed his story to a more concrete falsehood: Shroy (or as Cicero called him, "Shroyer") was the assistant prosecutor who had given permission to amend the ticket. That lie crumbled when it was later explained that Shroy's specialized "zone initiative attorney" position at the city prosecutor's office did not involve traffic or criminal matters, Shroy was not assigned to any arraignment courtroom, and multiple office policies would have prohibited Shroy from agreeing to the amendment that Cicero had filed. Further, at the time Cicero claimed to have spoken with Shroy about the ticket, Shroy was participating in an exit interview and packing up his office, as it was his second-to-last day working at the prosecutor's office. Unfazed by the solid evidence against him, Cicero continued to impugn Shroy's professional integrity by falsely claiming that he had filed the amended ticket with Shroy's blessing, that Shroy was now lying, and that Cicero had done no wrong.

{¶ 35} Cicero's fraud and intentional interference with his traffic-court and contempt proceedings formed the basis of the trial court's contempt finding and the city prosecutor's motion to vacate the judgment on Cicero's traffic violation on grounds that Cicero had obtained the reduced charge by means of fraud. After negotiations with Cicero's counsel, the court agreed to allow Cicero to withdraw his original plea instead of vacating the original entry on grounds of fraud. The court then allowed Cicero to enter a new plea to the original speeding violation, which was the latest of over 50. In exchange, the court required

14

Cicero's attorney to state on the record that Cicero recognized that he had delayed court proceedings and that he apologized for the inconvenience to the court.

{¶ 36} Although a sincere-appearing apology on the record might lead one to infer some degree of contrition on Cicero's part, Cicero and his attorney, William Ireland, made sure to dispel any possibility of that belief. Cicero testified that he had nothing to do with what he called the "canned" statement, that his attorney presented the statement solely to appease Judge VanDerKarr, and that his only concession was that additional time did pass during his proceedings due to the "back and forth" with the judge. Far from taking responsibility for his misconduct or even regretting any aspect of his role in the matter, Cicero continued to blame others and maintained that the proceedings against him were "bullshit," that they were entirely retaliatory, that Judge VanDerKarr had repeatedly "lied" and was "insane," and that Cicero "wanted to rip his Goddamn heart out." Ireland testified that the statement was Judge VanDerKarr's creation and that Cicero's actions had not in fact prejudiced the administration of justice because the entire proceeding was "pure hogwash." Despite the majority's attempt to distinguish Cicero's conduct here from his prior disciplinary proceedings, this testimony demonstrates exactly the same kind of evasive, deceptive, and dishonest conduct that resulted in Cicero's prior two suspensions.

{¶ 37} Cicero's refusal to acknowledge any wrongdoing and his inability to talk about his actions in an honest and nonevasive manner became even clearer during his argument before this court. Cicero avoided many of our questions with feigned confusion and attempts to divert the focus to allegedly conflicting testimony. Despite the record before us, which is replete with instances of Cicero's dogged refusal to accept even the slightest blame, he assured us that "I'm taking responsibility for all of it, from day one, and I always have." And yet, on those occasions when Cicero was at least somewhat responsive to our questions,

he maintained that Brandon Shroy and Judge VanDerKarr were the ones who were in the wrong or that it was their statements that should not be believed.

{¶ 38} There is nothing before us to suggest any genuineness in Cicero's purported acceptance of responsibility for his lies and misconduct, and his continued willingness to assail the integrity and careers of other legal professionals is lamentable. Thus, while Cicero averred to this court that "I've crucified myself more than I care to think about," his claims of self-flagellation are disingenuous. More importantly for purposes here, his implication that the punishment he says he has inflicted on himself is mitigating or, worse yet, that it is a sufficient sanction, is indefensible.

{¶ 39} Cicero's spectacular talent for deflecting blame and minimizing misbehavior reflects his inability to conduct himself in an ethical manner. That inability portends great risk to his clients and endangers the public and the legal profession.

{¶ 40} It is fortunate that our jurisprudence does not contain many cases that are similar to the one at hand. But the scarcity of guiding examples should not drive us to look to less serious cases in order to determine the appropriate sanction here. Although indefinite suspensions were appropriate in *Boggs*, *Frost*, and *Squeo*, the circumstances at play in those cases render them inapposite.

{¶ 41} It is true that the respondent in *Boggs* was not disbarred after his third disciplinary proceeding, but disbarment was apparently not considered as an option. *Id.,* 129 Ohio St.3d 190, 2011-Ohio-2637, 951 N.E.2d 65, at ¶ 30-32. In *Boggs*, the respondent's first disciplinary case resulted in a public reprimand, and the second involved a fully stayed suspension, which was suggested by the parties in a consent-to-discipline agreement. *Id.* at ¶ 1; *Columbus Bar Assn. v. Boggs*, 103 Ohio St.3d 108, 2004-Ohio-4657, 814 N.E.2d 815, ¶ 1, 15. In his third disciplinary case, in 2011, the respondent was truthful and cooperative during disciplinary proceedings, and the only question was whether a two-year

16

suspension or an indefinite suspension would be commensurate with his increasing misconduct, which primarily involved failing to keep accurate records for client trust accounts. *Id.* at ¶ 24, 30. Although Cicero similarly has a pattern of increasing misconduct, his violations are far more serious, and his proceedings involved none of the forthrightness or cooperation found in *Boggs*.

{¶ 42} The respondent in *Frost*, unlike Cicero, had no history of professional misconduct. *Frost,* 122 Ohio St.3d 219, 2009-Ohio-2870, 909 N.E.2d 1271, at ¶ 36. Her baseless allegations of defamation, bias, and corruption against attorneys and judges appeared to stem from unaddressed mental-health issues and did not involve the manipulative and selfishly motivated behavior evident in Cicero's cases. *Id.* at ¶ 43. This court considered disbarment as an option in the *Frost* case, but concluded that the lesser sanction of an indefinite suspension was more appropriate because the respondent's behavior did not involve a pervasive pattern of false accusations and manipulation of the legal system. *Id*. at ¶ 41-42. We cannot make that same finding to temper the result in Cicero's case.

{¶ 43} The pattern of multiple offenses forming the respondent's disciplinary history in *Squeo* involved mere administrative suspensions for failure to comply with registration and continuing-legal-education requirements. *Columbus Bar Assn. v. Squeo,* 133 Ohio St.3d 536, 2012-Ohio-5004, 979 N.E.2d 321, at ¶ 1, 6. Although the misconduct underlying Squeo's third disciplinary action might be serious enough to allow comparison with some of Cicero's conduct, the respondent's misconduct was not part of the longstanding pattern of dishonesty and recalcitrance that is before us today.

{¶ 44} The majority contends that Cicero's case is not comparable with the disbarment case, *Farrell*, because the respondent in *Farrell* engaged in a years-long pattern of dishonest and fraudulent conduct, intentionally deceived a court, and continued to lie to the disciplinary board and to this court while

claiming to be remorseful. Majority opinion at ¶ 23, citing *Farrell,* 129 Ohio St.3d 223, 2011-Ohio-2879, 951 N.E.2d 390, at ¶ 22, 33. But as the board recognized in an explicit finding, Cicero showed a "pattern of dishonesty and self-serving behavior that is prevalent throughout [Cicero's] disciplinary cases," i.e., from 1993 to 2012. The majority's description of *Farrell* almost perfectly matches up to Cicero's conduct, with the exception that Cicero's pattern of dishonesty has spanned over a decade rather than a few years and has involved repeated affronts to the dignity of the courts and the reputations of court officials and other legal professionals.

{¶ 45} In 1993, Cicero lied to clients, an assistant prosecutor, and colleagues by stating that he had an active sexual relationship with a judge who was presiding over a case of one of Cicero's clients. *Disciplinary Counsel v. Cicero*, 78 Ohio St.3d 351, 678 N.E.2d 517 (1997). He lied that the judge was so interested in having sex with him that she would probably rush through the client's proceedings in order to return to that pastime. *Id.* at 351. He lied about this to a client, who, as a result, encouraged others to retain Cicero's services. *Id.*

{¶ 46} In 2010, he betrayed the trust of a potential client by sharing the client's confidential information, in writing, with the high-profile head football coach at the Ohio State University. *Disciplinary Counsel v. Cicero*, 134 Ohio St.3d 311, 2012-Ohio-5457, 982 N.E.2d 650, ¶ 4-7. Cicero's betrayal, which caused widespread harm to others, was motivated by his base desire for self-aggrandizement. *Id.* at ¶ 17. This second disciplinary proceeding revealed that, like here, Cicero took no responsibility for his actions and provided disingenuous testimony that denied all wrongdoing in the face of overwhelming evidence. *Id.* at ¶ 7, 14, 17.

{¶ 47} Despite the grave misconduct at issue in Cicero's second disciplinary case, we imposed the measured sanction of a one-year suspension. *Id.* at ¶ 21. Little did we know that while that matter was pending before us,

Cicero was engaging in the very misconduct at issue in this case, which arose from yet another pattern of wrongdoing, his failure to abide by those most basic rules of law, motor-vehicle speed limits.

{¶ 48} In 2012, Cicero did not simply try to undermine a lawful citation issued by a police officer, which would have been bad enough. Instead, he attempted to avoid the consequences of his latest of over 50 speeding tickets, which had already earned him two driver's license suspensions, through lies and evasions. In other words, he habitually broke the law, and rather than accept the consequences, he attempted to defraud a court and then tried to cover up the fraud with additional lies and more aspersions against the court, a judge, a bailiff, prosecutors, and anyone else who might put him in danger of being held responsible for his actions.

{¶ 49} Contrary to the majority's stance, I see no reason to lessen Cicero's sanction simply because his misconduct was different this time. It does not matter that Cicero's three disciplinary cases did not spring from a common source. How he misbehaves is not relevant here. And even if it were relevant, there is a common thread running through his three cases. Cicero's pattern of dishonesty, blaming others, disrespect for the legal process and for the courts, self-serving behavior, and feigned remorse is unrelenting. In fact, it is his willingness to defraud and impugn the court system in a great variety of *unrelated* circumstances that is the most troubling of all.

{¶ 50} Cicero has failed to act ethically or respectfully toward the courts, failed to provide honest testimony to multiple disciplinary panels, and even failed to admit any genuine remorse to this court while claiming to take full responsibility for everything that has happened. He has proven willing to sabotage the integrity of legal proceedings and the reputations of other legal professionals to advance his personal interests, and he has proven to be unwilling to acknowledge any actual wrongdoing in the face of overwhelming evidence.

This certainly " 'suggests that he lacks the ability to conform his behavior to the ethical standards incumbent upon attorneys in this state.' " Majority opinion at ¶ 22, quoting *Farrell,* 129 Ohio St.3d 223, 2011-Ohio-2879, 951 N.E.2d 390, at ¶ 35.

{¶ 51} Cicero's behavior has reinforced the worst of stereotypes about the legal profession. In order to preserve the integrity of our courts, protect other legal professionals, and maintain the public's confidence in the legal profession, disbarment is the only suitable sanction here. I therefore dissent.

LANZINGER, J., concurs in the foregoing opinion.

_____

Scott J. Drexel, Disciplinary Counsel, Joseph M. Caligiuri, Chief Assistant Disciplinary Counsel, and Donald M. Scheetz, Assistant Disciplinary Counsel, for relator.

Christopher T. Cicero, pro se.

_____