O’Connor, C.J.,
dissenting.
{¶ 28} “[H]e who permits himself to tell a lie once, finds it much easier to do it a second and a third time, till at length it becomes habitual; he tells lies without attending to it, and truths without the world’s believing him. This falsehood of the tongue leads to that of the heart, and in time depraves all its good *14 dispositions.” Thomas Jefferson, Letter to Peter Carr (Aug. 19, 1785), reprinted in 8 The Papers of Thomas Jefferson 406 (1953).
{¶ 29} I must dissent. The panel and board came to the well-founded conclusion that Cicero’s version of events in this matter was wholly incredible. Cicero expressly accepted the board’s findings of fact and conclusions of law in the objections he has filed with this court. Despite this, the majority appears to lend credence to certain aspects of Cicero’s version of events and uses them to arrive at a conclusion that does not adequately recognize the insidiousness of Cicero’s behavior.
{¶ 30} I must also disagree with the majority’s logic in finding any substantive distinction between this case and Cincinnati Bar Assn. v. Farrell, 129 Ohio St.3d 223, 2011-Ohio-2879, 951 N.E.2d 390. Cicero’s pattern of selfishly motivated, deceitful conduct soundly measures up to the level of misconduct in Farrell and is far worse than the misconduct in Disciplinary Counsel v. Frost, 122 Ohio St.3d 219, 2009-Ohio-2870, 909 N.E.2d 1271, Columbus Bar Assn. v. Squeo, 133 Ohio St.3d 536, 2012-Ohio-5004, 979 N.E.2d 321, and Columbus Bar Assn. v. Boggs, 129 Ohio St.3d 190, 2011-Ohio-2637, 951 N.E.2d 65. Given the egregiousness of Cicero’s misconduct and the clear risk of recidivism, disbarment is the only appropriate sanction here. Anything less lowers our standards of ethical conduct for attorneys and further erodes the public’s faith in the bar.
{¶ 31} Although we are not bound by the findings and conclusions of the panel and board, “[w]e will defer to a panel’s credibility determinations in our independent review of discipline cases unless the record weighs heavily against those determinations.” Disciplinary Counsel v. Heiland, 116 Ohio St.3d 521, 2008-Ohio-91, 880 N.E.2d 467, ¶ 39, citing Cincinnati Bar Assn. v. Statzer, 101 Ohio St.3d 14, 2003-Ohio-6649, 800 N.E.2d 1117, ¶ 8. The panel and board in this case found that Cicero was deceitful throughout the underlying matter, that he made “misrepresentations at almost every turn,” and that his behavior during disciplinary proceedings was “inexcusable.” Nothing has been offered to rebut these determinations. To the contrary, Cicero accepts them. Yet the majority strays from the board’s determinations, which were based on the credibility of Cicero and others, when determining the appropriate sanction in this case.
{¶ 32} The panel in this case unequivocally found that Cicero “never received an offer from a prosecutor to amend his traffic citation.” It did not happen. Instead, Cicero strategically exploited the court system where he frequently worked in order to obtain a blank judgment entry. And he attempted to perpetrate a fraud on the court by unilaterally modifying the entry with no approval or even review by a prosecutor or judge and filing the entry with the clerk’s office. After a simple error in the entry brought Cicero’s fraud to light, he lied to Judge VanDerKarr and the entire prosecutor’s office, claiming that an *15 assistant prosecutor — who Cicero somehow could not name — had given him permission to amend his ticket. Cicero committed this falsehood to writing and submitted it to the court and the prosecutor’s office.
{¶ 33} But the charade did not end there. Rather than admit to the wrongdoing, Cicero threw out a school of red herrings, ignored by the majority, in a transparent attempt to avoid being caught red-handed with a nonexistent prosecutor. Cicero made the following outlandish excuses for his lie while under oath: he could not tell Judge VanDerKarr who the assistant prosecutor was because (1) no one had told him what the problem was with the judgment entry, preventing him from understanding that he was being asked to identify the assistant prosecutor, (2) Cicero was only asked which name he had given to Judge VanDerKarr when he initially asked for the blank judgment entry, preventing Cicero from understanding that what the questioners actually wanted to know was which prosecutor had agreed to amend the ticket, (3) Judge VanDerKarr was so unreasonably angry that Cicero could not get a word in edgewise, (4) Cicero was secretly protecting the assistant prosecutor from a vindictive chief prosecutor, (5) he was secretly protecting Judge VanDerKarr from the chief prosecutor and apparently from Judge VanDerKarr himself, (6) he did not want to give Judge VanDerKarr the satisfaction of having any information because the entire situation was Judge VanDerKarr’s fault, (7) the questions were all happening so fast that he did not have the wherewithal to provide the assistant prosecutor’s name, (8) some unnamed person or persons had asked Cicero “not to say anything.” Cicero’s quiver of untruths is notable for its depth, if nothing else.
{¶ 34} And moments after Cicero learned of information that made ex-assistant-prosecutor Brandon Shroy a convenient scapegoat, Cicero changed his story to a more concrete falsehood: Shroy (or as Cicero called him, “Shroyer”) was the assistant prosecutor who had given permission to amend the ticket. That lie crumbled when it was later explained that Shroy’s specialized “zone initiative attorney” position at the city prosecutor’s office did not involve traffic or criminal matters, Shroy was not assigned to any arraignment courtroom, and multiple office policies would have prohibited Shroy from agreeing to the amendment that Cicero had filed. Further, at the time Cicero claimed to have spoken with Shroy about the ticket, Shroy was participating in an exit interview and packing up his office, as it was his second-to-last day working at the prosecutor’s office. Unfazed by the solid evidence against him, Cicero continued to impugn Shroy’s professional integrity by falsely claiming that he had filed the amended ticket with Shroy’s blessing, that Shroy was now lying, and that Cicero had done no wrong.
{¶ 35} Cicero’s fraud and intentional interference with his traffic-court and contempt proceedings formed the basis of the trial court’s contempt finding and *16 the city prosecutor’s motion to vacate the judgment on Cicero’s traffic violation on grounds that Cicero had obtained the reduced charge by means of fraud. After negotiations with Cicero’s counsel, the court agreed to allow Cicero to withdraw his original plea instead of vacating the original entry on grounds of fraud. The court then allowed Cicero to enter a new plea to the original speeding violation, which was the latest of over 50. In exchange, the court required Cicero’s attorney to state on the record that Cicero recognized that he had delayed court proceedings and that he apologized for the inconvenience to the court.
{¶ 36} Although a sincere-appearing apology on the record might lead one to infer some degree of contrition on Cicero’s part, Cicero and his attorney, William Ireland, made sure to dispel any possibility of that belief. Cicero testified that he had nothing to do with what he called the “canned” statement, that his attorney presented the statement solely to appease Judge VanDerKarr, and that his only concession was that additional time did pass during his proceedings due to the “back and forth” with the judge. Far from taking responsibility for his misconduct or even regretting any aspect of his role in the matter, Cicero continued to blame others and maintained that the proceedings against him were “bullshit,” that they were entirely retaliatory, that Judge VanDerKarr had repeatedly “lied” and was “insane,” and that Cicero “wanted to rip his Goddamn heart out.” Ireland testified that the statement was Judge VanDerKarr’s creation and that Cicero’s actions had not in fact prejudiced the administration of justice, because the entire proceeding was “pure hogwash.” Despite the majority’s attempt to distinguish Cicero’s conduct here from his prior disciplinary proceedings, this testimony demonstrates exactly the same kind of evasive, deceptive, and dishonest conduct that resulted in Cicero’s prior two suspensions.
{¶ 37} Cicero’s refusal to acknowledge any wrongdoing and his inability to talk about his actions in an honest and nonevasive manner became even clearer during his argument before this court. Cicero avoided many of our questions with feigned confusion and attempts to divert the focus to allegedly conflicting testimony. Despite the record before us, which is replete with instances of Cicero’s dogged refusal to accept even the slightest blame, he assured us that “I’m taking responsibility for all of it, from day one, and I always have.” And yet, on those occasions when Cicero was at least somewhat responsive to our questions, he maintained that Brandon Shroy and Judge VanDerKarr were the ones who were in the wrong or that it was their statements that should not be believed.
{¶ 38} There is nothing before us to suggest any genuineness in Cicero’s purported acceptance of responsibility for his lies and misconduct, and his continued willingness to assail the integrity and careers of other legal profession *17 als is lamentable. Thus, while Cicero averred to this court that “I’ve crucified myself more than I care to think about,” his claims of self-flagellation are disingenuous. More importantly for purposes here, his implication that the punishment he says he has inflicted on himself is mitigating or, worse yet, that it is a sufficient sanction, is indefensible.
{¶ 39} Cicero’s spectacular talent for deflecting blame and minimizing misbehavior reflects his inability to conduct himself in an ethical manner. That inability portends great risk to his clients and endangers the public and the legal profession.
{¶ 40} It is fortunate that our jurisprudence does not contain many cases that are similar to the one at hand. But the scarcity of guiding examples should not drive us to look to less serious cases in order to determine the appropriate sanction here. Although indefinite suspensions were appropriate in Boggs, Frost, and Squeo, the circumstances at play in those cases render them inapposite.
{¶ 41} It is true that the respondent in Boggs was not disbarred after his third disciplinary proceeding, but disbarment was apparently not considered as an option. Boggs, 129 Ohio St.3d 190, 2011-Ohio-2637, 951 N.E.2d 65, at ¶ 30-32. In Boggs, the respondent’s first disciplinary case resulted in a public reprimand, and the second involved a fully stayed suspension, which was suggested by the parties in a consent-to-discipline agreement. Id. at ¶ 1; Columbus Bar Assn. v. Boggs, 103 Ohio St.3d 108, 2004-Ohio-4657, 814 N.E.2d 815, ¶ 1, 15. In his third disciplinary case, in 2011, the respondent was truthful and cooperative during disciplinary proceedings, and the only question was whether a two-year suspension or an indefinite suspension would be commensurate with his increasing misconduct, which primarily involved failing to keep accurate records for client trust accounts. Id. at ¶ 24, 30. Although Cicero similarly has a pattern of increasing misconduct, his violations are far more serious, and his proceedings involved none of the forthrightness or cooperation found in Boggs.
{¶ 42} The respondent in Frost, unlike Cicero, had no history of professional misconduct. Frost, 122 Ohio St.3d 219, 2009-Ohio-2870, 909 N.E.2d 1271, at ¶ 36. Her baseless allegations of defamation, bias, and corruption against attorneys and judges appeared to stem from unaddressed mental-health issues and did not involve the manipulative and selfishly motivated behavior evident in Cicero’s cases. Id. at ¶ 43. This court considered disbarment as an option in the Frost case, but concluded that the lesser sanction of an indefinite suspension was more appropriate because the respondent’s behavior did not involve a pervasive pattern of false accusations and manipulation of the legal system. Id. at ¶ 41-42. We cannot make that same finding to temper the result in Cicero’s case.
{¶ 43} The pattern of multiple offenses forming the respondent’s disciplinary history in Squeo involved mere administrative suspensions for failure to comply *18 with registration and continuing-legal-education requirements. Columbus Bar Assn. v. Squeo, 133 Ohio St.3d 536, 2012-Ohio-5004, 979 N.E.2d 321, at ¶ 1, 6. Although the misconduct underlying Squeo’s third disciplinary action might be serious enough to allowr comparison with some of Cicero’s conduct, the respondent’s misconduct was not part of the longstanding pattern of dishonesty and recalcitrance that is before us today.
{¶ 44} The majority contends that Cicero’s case is not comparable with the disbarment case, Farrell, because the respondent in Farrell engaged in a years-long pattern of dishonest and fraudulent conduct, intentionally deceived a court, and continued to lie to the disciplinary board and to this court while claiming to be remorseful. Majority opinion at ¶ 23, citing Farrell, 129 Ohio St.3d 223, 2011-Ohio-2879, 951 N.E.2d 390, at ¶ 22, 33. But as the board recognized in an explicit finding, Cicero showed a “pattern of dishonesty and self-serving behavior that is prevalent throughout [Cicero’s] disciplinary cases,” i.e., from 1993 to 2012. The majority’s description of Farrell almost perfectly matches up to Cicero’s conduct, with the exception that Cicero’s pattern of dishonesty has spanned over a decade rather than a few years and has involved repeated affronts to the dignity of the courts and the reputations of court officials and other legal professionals.
{¶ 45} In 1993, Cicero lied to clients, an assistant prosecutor, and colleagues by stating that he had an active sexual relationship with a judge who was presiding over a case of one of Cicero’s clients. Disciplinary Counsel v. Cicero, 78 Ohio St.3d 351, 678 N.E.2d 517 (1997). He lied that the judge was so interested in having sex with him that she would probably rush through the client’s proceedings in order to return to that pastime. Id. at 351. He lied about this to a client, who, as a result, encouraged others to retain Cicero’s services. Id.
{¶ 46} In 2010, he betrayed the trust of a potential client by sharing the client’s confidential information, in writing, with the high-profile head football coach at the Ohio State University. Disciplinary Counsel v. Cicero, 134 Ohio St.3d 311, 2012-Ohio-5457, 982 N.E.2d 650, ¶ 4-7. Cicero’s betrayal, which caused widespread harm to others, was motivated by his base desire for self-aggrandizement. Id. at ¶ 17. This second disciplinary proceeding revealed that, like here, Cicero took no responsibility for his actions and provided disingenuous testimony that denied all wrongdoing in the face of overwhelming evidence. Id. at ¶ 7, 14, 17.
{¶ 47} Despite the grave misconduct at issue in Cicero’s second disciplinary case, we imposed the measured sanction of a one-year suspension. Id. at ¶ 21. Little did we know that while that matter was pending before us, Cicero was engaging in the very misconduct at issue in this case, which arose from yet another pattern of wrongdoing, his failure to abide by those most basic rules of law, motor-vehicle speed limits.
*19 Scott J. Drexel, Disciplinary Counsel, Joseph M. Caligiuri, Chief Assistant Disciplinary Counsel, and Donald M. Scheetz, Assistant Disciplinary Counsel, for relator.
{¶ 48} In 2012, Cicero did not simply try to undermine a lawful citation issued by a police officer, which would have been bad enough. Instead, he attempted to avoid the consequences of his latest of over 50 speeding tickets, which had already earned him two driver’s license suspensions, through lies and evasions. In other words, he habitually broke the law, and rather than accept the consequences, he attempted to defraud a court and then tried to cover up the fraud with additional lies and more aspersions against the court, a judge, a bailiff, prosecutors, and anyone else who might put him in danger of being held responsible for his actions.
{¶ 49} Contrary to the majority’s stance, I see no reason to lessen Cicero’s sanction simply because his misconduct was different this time. It does not matter that Cicero’s three disciplinary cases did not spring from a common source. How he misbehaves is not relevant here. And even if it were relevant, there is a common thread running through his three cases. Cicero’s pattern of dishonesty, blaming others, disrespect for the legal process and for the courts, self-serving behavior, and feigned remorse is unrelenting. In fact, it is his willingness to defraud and impugn the court system in a great variety of unrelated circumstances that is the most troubling of all.
{¶ 50} Cicero has failed to act ethically or respectfully toward the courts, failed to provide honest testimony to multiple disciplinary panels, and even failed to admit any genuine remorse to this court while claiming to take full responsibility for everything that has happened. He has proven willing to sabotage the integrity of legal proceedings and the reputations of other legal professionals to advance his personal interests, and he has proven to be unwilling to acknowledge any actual wrongdoing in the face of overwhelming evidence. This certainly “ ‘suggests that he lacks the ability to conform his behavior to the ethical standards incumbent upon attorneys in this state.’ ” Majority opinion at ¶ 22, quoting Farrell, 129 Ohio St.3d 223, 2011-Ohio-2879, 951 N.E.2d 390, at ¶ 35.
{¶ 51} Cicero’s behavior has reinforced the worst of stereotypes about the legal profession. In order to preserve the integrity of our courts, protect other legal professionals, and maintain the public’s confidence in the legal profession, disbarment is the only suitable sanction here. I therefore dissent.
Lanzinger, J., concurs in the foregoing opinion.
*20 Christopher T. Cicero, pro se.